**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| HOMEWELL FRANCHISING, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | Case No.: 7:24-cv-00101-O |
| v. | § | |
| | § | |
| EVANSTON INSURANCE COMPANY | § | |
| | § | |
| Defendant. | § | |

**APPENDIX IN SUPPORT OF PLAINTIFF'S
<u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

| <u>Exhibit</u> | <u>Description</u> | <u>App. No.</u> |
|---|---|---|
| 1 | Affidavit of Casey McCleskey | App. 1 – App. 4 |
| 1-A | Policy No. MKLV4PEO001962 issued by Evanston to HomeWell for the period from September 1, 2023 to September 1, 2024 | App. 5 – App. 61 |
| 1-B | Complaint, *Julie Egeland, et al. v. A.S.K. Consulting & Design LLC dba HomeWell Care Services, et al.*, Cause No. 23CV008666 (Cal. Super. Ct. Sacramento County) | App. 62 – App. 90 |
| 1-C | Email string among Shawna Bishop, Casey McCleskey et al. (Nov. 1, 2023) | App. 91 – App. 94 |
| 1-D | Email string among Shawna Bishop, Casey McCleskey et al. (Nov. 14, 2023 – Jan. 24, 2024) | App. 95 – App. 100 |

Respectfully submitted,

*/s/ Natalie DuBose*

Natalie DuBose
State Bar No. 24077481
natalie.dubose@haynesboone.com
Reese Letourneau
State Bar No. 24137622
reese.letourneau@haynesboone.com
HAYNES AND BOONE, LLP
2801 N. Harwood St., Suite 2300
Dallas, Texas 75201
Telephone:      (214) 651-5000
Fax:              (214) 651-5940

Adrian Azer
State Bar No. 24048332
adrian.azer@haynesboone.com
HAYNES AND BOONE, LLP
800 17th St. NW, Suite 500
Washington, D.C. 20006
Telephone:      (202) 654-4500
Fax:              (202) 654-4501

**ATTORNEYS FOR PLAINTIFF
HOMEWELL FRANCHISING, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Marc J. Wojciechowski
WOJCIECHOWSKI & ASSOCIATES, P.C.
17447 Kuykendahl Road, Suite 200
Spring, Texas 77379

/s/ *Natalie DuBose*
Natalie DuBose

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## WICHITA FALLS DIVISION

| | | |
|---|---|---|
| HOMEWELL FRANCHISING, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | Case No.: 7:24-cv-00101-O |
| v. | § | |
| | § | |
| EVANSTON INSURANCE COMPANY | § | |
| | § | |
| Defendant. | § | |

## **AFFIDAVIT OF CASEY MCCLESKEY**

BEFORE ME, the undersigned Notary Public, on this day personally appeared Casey McCleskey, known to me to be the person whose name is subscribed below, who being duly sworn, deposed and stated as follows:

1.    My name is Casey McCleskey. I am over twenty-one (21) years of age, have never been convicted of a felony, and I am fully competent to make this Affidavit. I am able to swear, and I hereby do swear, that all of the facts stated in this Affidavit are true and correct and within my personal knowledge.

2.    I am the Chief Financial Officer for HomeWell Franchising, Inc. ("HomeWell"). I have held this position since 2018.

3.    HomeWell is a franchisor that grants its franchisees licenses to independently own and operate their business that provide home care services for seniors using HomeWell's trademarks. HomeWell maintains a corporate HomeWell Care Services website, www.homewellcares.com, that includes certain information about its business and its franchisee's businesses.

4.     As the Chief Financial Officer, I am generally familiar with the insurance policy purchased by HomeWell described below, as well as the correspondence exchanged between Evanston Insurance Company ("Evanston") and HomeWell regarding HomeWell's claim for coverage.

5.     Attached as Exhibit "A" is a true and correct copy of Policy No. MKLV4PEO001962 issued by Evanston to HomeWell for the period from September 1, 2023 to September 1, 2024.

6.     In my role as the Chief Financial Officer, I also have general knowledge of the litigation matters in which HomeWell is named as a party and the costs associated therewith.

7.     In particular, I am generally familiar with the status of the underlying *Egeland* Lawsuit (defined herein), the defense of which is the subject of the above-entitled and numbered litigation.

8.     On September 18, 2023, William Clair filed a lawsuit in his individual capacity, as successor in interest to Julie Egeland, and on behalf of Julie Egeland (decedent) in the case styled *Julie Egeland, et al. v. A.S.K. Consulting & Design LLC dba HomeWell Care Services, et al.*, Cause No. 23CV008666 in the Superior Court of the State of California in and for the County of Sacramento (the "*Egeland* Lawsuit"), which is currently pending.  HomeWell was later served with the complaint.

9.     A true and correct copy of live complaint in the *Egeland* Lawsuit is attached hereto as Exhibit "B."

10.     Shortly thereafter, HomeWell provided notice of the *Egeland* Lawsuit to Evanston and requested a defense (the "Claim").

**AFFIDAVIT OF CASEY MCCLESKEY**                                                                 **PAGE 2**

11.     On November 1, 2023, Ms. Shawna Bishop acknowledged receipt of the Claim on behalf of Evanston.  Attached as Exhibit "C" is a true and correct copy of that correspondence.

12.     On behalf of HomeWell, I continued to exchange emails with Ms. Bishop regarding the defense of the Claim between November 2023 and January 2024.  Although Evanston originally acknowledged that the Claim was covered under the Insuring Agreement, Evanston later reversed course and denied the Claim.

13.     A true and correct copy of that email exchange between November 14, 2023 and January 24, 2024 is attached hereto as Exhibit "D."

14.     The *Egeland* Lawsuit remains pending, and, as a result of Evanston's refusal to defend HomeWell under the Policy, HomeWell is currently paying for its own defense.

15.     HomeWell retained the law firm of Haynes and Boone, LLP to defend it in the *Egeland* Lawsuit.

16.     To date, HomeWell has spent over $360,000 defending the allegations in the *Egeland* Lawsuit.

_____
CASEY MCCLESKEY

SWORN TO AND SUBSCRIBED before me on this 15 day of January, 2025.

_____
Notary Public

ANGELA GOAD
MY COMMISSION EXPIRES
11/14/2026
NOTARY ID: 1148202-2

**AFFIDAVIT OF CASEY MCCLESKEY**                                    **PAGE 3**

**App. 4**

# EXHIBIT 1-A



## AM Best Credit Rating

### Carrier: Evanston Insurance Company
### AM Best Rating:  A Excellent

AM Best is a global credit rating agency with a focus on the insurance industry. **This rating is a recognized indicator of an insurer's financial strength and ability to meet ongoing obligations to policyholders.** Lockton Affinity does not perform an independent analysis and therefore cannot guarantee or make any representations in regards to the financial condition of any insurance companies with which we place business.

**Visit [ambest.com](ambest.com) for more information about AM Best and their rating methodology.**

AM Best is not engaged in the offer or sale of any security and does not provide investment advice of any kind. These ratings are not a warranty of an insurer's current or future ability to meet its contractual obligations. Further, all ratings, are provided "as is," without warranty of any kind, express or implied. The rating information is current as of the delivery date of this policy and is subject to change without notice.



# IMPORTANT INFORMATION FOR POLICYHOLDERS

### ADDITIONAL INSURED COVERAGE
An additional insured is a person or entity, other than the named insured (you), who is protected by the terms of the policy for specified events or exposures. In general, coverage for an additional insured applies only when injury or damage is caused, at least partially, by acts or omissions of you as the named insured.

In addition to describing the insurance available to you as the named insured, a Certificate of Insurance may also indicate that a certificate holder is an additional insured under the referenced policy. This is informational only.  The policy issued to you, the named insured, must include the proper additional insured endorsements for coverage to apply. Review your policy carefully before entering into any agreement that requires you to add another party as an additional insured.

Contact us to add an additional insured to your policy. Note that all requests are subject to approval from the insurance company.

### CERTIFICATES OF INSURANCE
A Certificate of Insurance is issued to provide evidence of insurance only. It is not a contract or an endorsement to the policy. Certificates are simply snapshots of the basic policy coverage and limits.  They do not amend, extend or alter the coverage afforded by the policy. The Certificate of Insurance confers no rights upon the certificate holder.

### NOTICE OF CANCELLATION
The standard Certificate of Insurance includes the following statement regarding cancellation notice: "*Should any of the above described policies be cancelled before the expiration date thereof, notice will be delivered in accordance with the policy provisions.*"

Most certificate holders, including additional insureds, will not receive a notice of cancellation or notice of nonrenewal of your policy.  There are a few exceptions, but only when the proper endorsement is attached to the policy and if the cancellation/non-renewal is initiated by the company.  These include:
- Mortgagees (Property Coverage)
- Lender Loss Payees(Property Coverage)
- Additional Insured Lessor (Auto Liability Coverage)

The policy must be specifically endorsed to provide notification of policy cancellation or non-renewal to any other parties. Such requests are subject to prior approval of you as the named insured and the insurance company.

If you have any questions, please contact us at:
Lockton Affinity Home Care Program
800-723-9624


**MARKEL**

# EVANSTON INSURANCE COMPANY

# DECLARATIONS

**SOME COVERAGE PARTS ARE CLAIMS MADE AND REPORTED. PLEASE READ THE COVERAGE PART(S) CAREFULLY. CLAIMS-MADE AND REPORTED COVERAGE PARTS REQUIRE THAT A CLAIM BE MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR EXTENDED REPORTING PERIOD, IF APPLICABLE, AND REPORTED TO THE COMPANY IN WRITING DURING THE POLICY PERIOD OR EXTENDED REPORTING PERIOD, IF APPLICABLE, BUT NO LATER THAN 60 DAYS AFTER THE DATE OF EXPIRATION OF THE POLICY PERIOD OR DURING THE EXTENDED REPORTING PERIOD, IF APPLICABLE.**

**PLEASE NOTE THAT AMOUNTS INCURRED AS CLAIM EXPENSES WILL REDUCE THE LIMIT OF LIABILITY AVAILABLE AND WILL BE APPLIED AGAINST THE DEDUCTIBLE OR RETENTION AMOUNT.**

POLICY NUMBER: MKLV4PEO001962                          RENEWAL OF POLICY: MKLV4PEO001607

Named Insured and Mailing Address (No., Street, Town or City, County, State, Zip Code)
HomeWell Franchising, Inc.
812 Sheppard Rd
Burkburnett, TX 76354-2706

Policy Period: From  09/01/2023   to  09/01/2024       at 12:01 A.M. Standard Time at the mailing address shown above.

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, THE COMPANY AGREE WITH THE INSUREDS TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| **Producer Number, Name and Mailing Address** |
| --- |
| 211894 |
| McGowan, Donnelly & Oberheu LLC |
| 2700 Via Fortuna Drive, Suite 145 |
| Austin, TX 78746 |

**App. 8**

## Insuring Agreement Schedule

This Policy includes only those Insuring Agreements designated below by "X" (☒) as purchased. If Insuring Agreement is not expressly designated as purchased, this Policy does not include such coverage.

| Professional Liability Insurance | | | | | |
|---|---|---|---|---|---|
| **Insuring Agreement** | **Limits Of Liability** | | **Deductible** | | **Retroactive Date** |
| ☒ Professional Liability: or<br>☐ Information Technology Professionals: | $1,000,000<br>$1,000,000 | Each Claim<br>Aggregate | $35,000<br>$105,000 | Each Claim<br>Aggregate | 09/01/2016 |
| Additional Payments | | | | | |
| ☒ TCPA Violation: | $25,000 | | $35,000 | | 09/01/2016 |
| ☒ FCRA Violation: | $25,000 | | $35,000 | | 09/01/2016 |
| ☐ Sexual Injury: | | | | | |
| ☒ Third Party Discrimination: | $25,000 | | $35,000 | | 09/01/2016 |
| Supplementary Payments | | | | | |
| ☒ Disciplinary Proceeding: | $25,000 | | Not Applicable | | 09/01/2016 |
| ☒ Loss Of Earnings And Expense Reimbursement: | $10,000<br>$25,000 | Per Day<br>Maximum | Not Applicable | | 09/01/2016 |
| ☒ Pre-Claim Assistance Expenses: | $5,000 | | Not Applicable | | 09/01/2016 |
| ☒ Public Relations Expenses: | $5,000 | | Not Applicable | | 09/01/2016 |
| ☒ Subpoena And Record Request Assistance: | $5,000 | | Not Applicable | | 09/01/2016 |
| Coverage Part Aggregate Limit Of Liability: | $1,000,000 | | | | |
| Description of Professional Services: See Scope of Services via MEEO 5213 08 21 for others for a fee | | | | | |

| General Liability Insurance For Professionals | | | |
|---|---|---|---|
| **Coverage** | **Limits Of Liability** | **Deductible** | **Retroactive Date** |
| Each Occurrence:<br>Damage To Premises: | Any One Premises | Each Occurrence | |
| Medical Expense: | Each Person | | |
| Personal & Advertising Injury: | Each Person Or Organization | Each Person Or Organization | |
| General Aggregate:<br>Products/Completed Operations Aggregate: | | | |

**App. 9**

| Supplementary Payments ☐ Loss Of Earnings And Expense Reimbursement: | Per Day Maximum |
|---|---|

Description of Specified Products, Goods, Operations, or Premises:

| Markel Cyber 360<sup>SM</sup> Insurance | | | |
|---|---|---|---|
| **Insuring Agreements** | **Insuring Agreement Aggregate Limit Of Liability** | **Retention Amount/ Retention Period** | **Retroactive Date** |
| ☐ Cyber And Privacy Liability | | | |
| ☐ Regulatory Fines | | | |
| ☐ Media Offense Liability | | | |
| ☐ System And Data Rectification Costs And Financial Loss | | | |
| ☐ Extortion Loss | | | |
| ☐ Security Business Interruption Event | | | |
| ☐ Contingent Security Business Interruption Event | | | |
| ☐ System Failure Business Interruption Event | | | |
| ☐ Contingent System Failure Business Interruption Event | | | |
| ☐ Privacy Breach Notification And Mitigation Costs | | | |
| ☐ PCI DSS Assessments | | | |
| ☐ Social Engineering Loss | | | |
| ☐ Telecommunications Fraud And Cryptojacking | | | |
| Markel Cyber 360<sup>SM</sup> Insurance Coverage Part Aggregate Limit Of Liability: | | | |
| Supplementary Payments ☐ Loss Of Earnings And Expense Reimbursement: | Per Day Maximum | | |

| **Media Offense Liability Insurance For Professionals** | | | |
|---|---|---|---|
| **Coverage** | **Limits Of Liability** | **Deductible** | **Retroactive Date** |
| ☐ Media Offense Liability: | Each Claim Aggregate | Each Claim Aggregate | |
| Supplementary Payments ☐ Loss Of Earnings And Expense Reimbursement: | Per Day Maximum | | |

**App. 10**

| Coverage Parts Which Share An Aggregate Limit Of Liability |
|---|
| Coverages designated below by "X" (☒) share the Combined Aggregate Limit Of Liability |
| ☐  Professional Liability Insurance |
| ☐  General Liability For Professionals |
| ☐  Markel Cyber 360SM Insurance |
| ☐  Media Offense Liability Insurance For Professionals |
| ☒  NONE |

| Combined Aggregate Limit Of Liability | |
|---|---|
| $1,000,000 | All Damages, Regulatory Fines, Breach Mitigation Expenses, Loss and Claim Expenses under all purchased Coverage Parts, combined. |

| Premium | |
|---|---|
| Professional Liability Insurance: | Included |
| General Liability For Professionals: | Not Purchased |
| Markel Cyber 360SM Insurance: | Not Purchased |
| Media Offense Liability Insurance For Professionals: | Not Purchased |
| **Total Adjusted Annual Premium**: | $37,639 |

| Extended Reporting Period | |
|---|---|
| Additional Period(Months): | Premium Percentage For Extended Reporting Period: |
| 12 | 100% |
| 24 | 150% |
| 36 | 200% |

| Endorsements |
|---|
| Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue: |
| **SEE MDIL 1001 ATTACHED** |

**These declarations, together with the Common Policy Conditions and Coverage Form(s) and any Endorsement(s), complete the above numbered policy.**

Countersigned: _____08/29/2023_____    By: _____

**DATE**                                       **AUTHORIZED REPRESENTATIVE**

# TEXAS DISCLOSURE NOTICE

**This insurance contract is with an insurer not licensed to transact insurance in this state and is issued and delivered as surplus line coverage under the Texas insurance statutes. The Texas Department of Insurance does not audit the finances or review the solvency of the surplus lines insurer providing this coverage, and the insurer is not a member of the property and casualty insurance guaranty association created under Chapter 462, Insurance Code.  Chapter 225, Insurance Code, requires payment of a 4.85% percent tax on gross premium.**

**TEXAS SURPLUS LICENSEE:**

McGowan & Company, Inc.

20595 Lorain Road

Fairview Park, Ohio 44126

| | |
|---|---|
| **Premium:** | $37,639.00 |
| **Fees:** | $500.00 |
| **Surplus Tax:** | $1,849.74 |
| **Stamping Fee:** | $28.60 |
| **Total:** | $40,017.34 |

**App. 12**

# TEXAS NOTICE TO POLICYHOLDERS

| IMPORTANT NOTICE | AVISO IMPORTANTE |
|---|---|
| Have a complaint or need help? | ¿Tiene una queja o necesita ayuda? |

Have a complaint or need help?

If you have a problem with a claim or your premium, call your insurance company or HMO first. If you can't work out the issue, the Texas Department of Insurance may be able to help.

Even if you file a complaint with the Texas Department of Insurance, you should also file a complaint or appeal through your insurance company or HMO. If you don't, you may lose your right to appeal.

To get information or file a complaint with your insurance company or HMO:

**Evanston Insurance Company**
**Toll-free:** 1-800-507-7626
Email:     Cyber360-US@markel.com
Mail:      Ten Parkway North, Deerfield, Illinois 60015

To get help with an insurance question or file a complaint with the state:

**The Texas Department of Insurance**
Call with a question: 1-800-252-3439
Mail: MC 111-1A, P.O. Box 149091, Austin, TX 78714-9091

File a complaint: www.tdi.texas.gov
Email: ConsumerProtection@tdi.texas.gov

¿Tiene una queja o necesita ayuda?

Si tiene un problema con una reclamación o con su prima de seguro, llame primero a su compañía de seguros o HMO. Si no puede resolver el problema, es posible que el Departamento de Seguros de Texas (Texas Department of Insurance, por su nombre en inglés) pueda ayudar.

Aun si usted presenta una queja ante el Departamento de Seguros de Texas, también debe presentar una queja a través del proceso de quejas o de apelaciones de sucompañía de seguros o HMO. Si no lo hace, podría perder su derecho para apelar.

Para obtener información o para presentar una queja ante su compañía de seguros o HMO:

**Evanston Insurance Company**
**Teléfono gratuito:** 1-800-507-7626
Correo electrónico:  Cyber360-US@markel.com
Dirección postal:    Ten Parkway North, Deerfield, Illinois 60015

Para obtener ayuda con una pregunta relacionada con los seguros o para presentar una queja ante el estado:

**El Departamento de Seguros de Texas**
Llame con sus preguntas al: 1-800-252-3439
Dirección postal: MC 111-1A, P.O. Box 149091, Austin, TX 78714-9091

Presente una queja en: www.tdi.texas.gov
Correo electrónico: ConsumerProtection@tdi.texas.gov



POLICY NUMBER: MKLV4PEO001962

# EVANSTON INSURANCE COMPANY

## FORMS SCHEDULE

| FORM NUMBER | FORM NAME |
|---|---|
| MJIL 1000 08 10 | Policy Jacket/Signature Page |
| MPEO 5000 08 18 | Markel's Designed Protection Risk Management Resources For Professionals |
| MPIL 1007 01 20 | Privacy Notice |
| MPIL 1009-TX 05 20 | Texas Important Notice |
| MPIL 1010-TX 05 10 | Texas Surplus Lines Notice |
| MPIL 1083 04 15 | U.S. Treasury Department's Office Of Foreign Assets Control ("OFAC") Advisory Notice To Policyholders |
| MPIL 1116 02 20 | Notice To Policyholders Claim Reporting |
| MDIL 1001 08 11 | Forms Schedule |
| MDEO 5000 10 20 | Declarations |
| MEEO 5000 10 20 | Professional Liability Insurance Coverage Part |
| MEEO 5700 10 20 | Common Policy Conditions |
| MEEO 5213 08 21 | Franchisors |
| MEEO 5256 10 20 | Minimum Earned Premium |
| MEEO 5306 10 20 | Exclusion - Medical Malpractice |
| MEEO 5309 10 20 | Exclusion - Nuclear Energy Liability (Broad Form) |
| MEEO 5310 10 20 | Exclusion - Specified Entity |
| MEEO 5316 10 20 | Exclusion - Asbestos |
| MEEO 5327 10 20 | Exclusion - Vulnerable Adult Abuse |
| MEEO 5337 10 20 | Exclusion - Violation Of Statutes Related To Personal Data |
| MEEO 5354 05 21 | Amended Pollution Exclusion |
| MEEO 5418-TX 10 20 | Texas Amendatory |
| MEEO 5577 05 21 | Amended Exclusions - Media-Related Offenses And Patents, Copyrights, Or Trade Secrets |
| MEIL 1200 02 20 | Service of Suit |
| MEIL 1330 08 17 | Exclusion - Unmanned Aircraft |
| MIL 1214 09 17 | Trade or Economic Sanctions |

**PROFESSIONAL LIABILITY**

**MARKEL**

# EVANSTON INSURANCE COMPANY

## PROFESSIONAL LIABILITY INSURANCE COVERAGE PART

SECTION I – THE INSURED ................................................................................................................................ 2

SECTION II – INSURING AGREEMENTS ......................................................................................................... 2

SECTION III – DEFINITIONS ............................................................................................................................. 6

SECTION IV – EXCLUSIONS ............................................................................................................................ 9

SECTION V – TERRITORY .............................................................................................................................. 12

SECTION VI – LIMITS OF LIABILITY, DEDUCTIBLES, AND INTERRELATED WRONGFUL ACTS .......... 12

SECTION VII – DEFENSE, SETTLEMENTS AND CLAIM EXPENSES ......................................................... 13

SECTION VIII – CLAIMS REPORTING AND NOTICE .................................................................................... 14

SECTION IX – EXTENDED REPORTING PERIOD ........................................................................................ 15

SECTION X – CHANGES IN OWNERSHIP .................................................................................................... 16

# Professional Liability Insurance Coverage Part

**THIS IS A CLAIMS-MADE AND REPORTED COVERAGE PART. THIS COVERAGE PART REQUIRES THAT A CLAIM BE MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR THE EXTENDED REPORTING PERIOD, IF APPLICABLE, AND REPORTED TO THE COMPANY IN WRITING DURING THE POLICY PERIOD OR THE EXTENDED REPORTING PERIOD, IF APPLICABLE, BUT NO LATER THAN 60 DAYS AFTER THE DATE OF EXPIRATION OF THE POLICY PERIOD OR THE EXTENDED REPORTING PERIOD, IF APPLICABLE. PLEASE READ THE POLICY CAREFULLY.**

**PLEASE NOTE THAT AMOUNTS INCURRED AS CLAIM EXPENSES WILL REDUCE THE LIMIT OF LIABILITY AVAILABLE AND WILL BE APPLIED AGAINST THE DEDUCTIBLE AMOUNT.**

The Company, relying upon the statements in the **Application**, which is deemed incorporated into this Policy and forms a part hereof, and in consideration of the payment of the premium, agrees with the **Insured** as follows:

## SECTION I – THE INSURED

The word **Insured**, whether in the singular or plural, means:

**A.** The Named Insured herein defined as the person(s) or organization(s) stated in the Declarations and any **Subsidiary** or **Predecessor Entity** of such organization(s) as of inception of the **Policy Period**;

**B.** Any past or current principal, partner, member, manager, officer, director, trustee, shareholder, or employee of the Named Insured solely while acting on behalf of the Named Insured and within the scope of their duties as such;

**C.** The spouse or **Domestic Partner** of each **Insured** in Paragraph **B.** above, but only for each such **Insured's** liability as is otherwise covered herein;

**D.** The heirs, executors, administrators, assigns, and legal representatives of each **Insured** in Paragraphs **A.** through **C.** above in the event of death, incapacity, or bankruptcy of each such **Insured**, but only for each such **Insured's** liability as is otherwise covered herein; and

**E.** Any natural person who is an independent contractor of the Named Insured solely while acting within their professional capacity on behalf of the Named Insured.

## SECTION II – INSURING AGREEMENTS

**A. Professional Liability Coverage**

The Company shall pay on behalf of the **Insured** all sums in excess of the Deductible stated in the Declarations that the **Insured** becomes legally obligated to pay as **Damages** and **Claim Expenses** incurred as a result of a **Claim** first made against the **Insured** during the **Policy Period** or the Extended Reporting Period, if applicable, and reported to the Company pursuant to Paragraph **A.** Claim Reporting Provision of Section **VIII** – Claims Reporting And Notice by reason of a:

**1. Wrongful Act**; or

**2. Personal Injury**;

in the performance of **Professional Services** rendered or that should have been rendered by the **Insured** or by any person for whose **Wrongful Act** or **Personal Injury** the **Insured** is legally responsible, provided:

**a.** The **Wrongful Act** or **Personal Injury** happens during the **Policy Period** or on or after the applicable **Retroactive Date** and before the end of the **Policy Period**; and

**b.** Prior to the effective date of the first date of continuous coverage of this Coverage Part with the Company, no **Insured** had any knowledge of such **Wrongful Act** or **Personal Injury**, or any fact, circumstance, situation, or incident which would lead a reasonable person in the **Insured's** position to conclude that a **Claim** was likely.

**B. Additional Payments**

**1. TCPA Violation**

The Company shall pay on behalf of the **Insured** all sums in excess of the Deductible stated in the Declarations and up to the TCPA Violation Limit Of Liability stated in the Declarations, per **Policy Period** including the Extended Reporting Period, if applicable, that the **Insured** becomes legally obligated to pay as **Damages** and **Claim Expenses** incurred as a result of a **Claim** first made against the **Insured** during the **Policy Period** or the Extended Reporting Period, if applicable, and reported to the Company pursuant to Paragraph **A.** Claim Reporting Provision of Section **VIII** – Claims Reporting And Notice by reason of a violation of the Telephone Consumer Protection Act of 1991 (TCPA) and amendments thereto or any similar or related federal, state, or local statute, law, rule, ordinance, or regulation in the performance of **Professional Services** rendered or that should have been rendered by the **Insured**, provided:

**a.** The TCPA violation happens during the **Policy Period** or on or after the applicable **Retroactive Date** and before the end of the **Policy Period**; and

**b.** Prior to the effective date of this Coverage Part, no **Insured** had any knowledge of such violation, or any fact, circumstance, situation, or incident which would lead a reasonable person in the **Insured's** position to conclude that a **Claim** was likely.

No coverage for TCPA Violations is provided by this Policy except as provided by this Paragraph **B.1.** TCPA Violation of Section **II** – Insuring Agreements.

2. **FCRA Violation**

The Company shall pay on behalf of the **Insured** all sums in excess of the Deductible stated in the Declarations and up to the FCRA Violation Limit Of Liability stated in the Declarations, per **Policy Period** including the Extended Reporting Period, if applicable, that the **Insured** becomes legally obligated to pay as **Damages** and **Claim Expenses** incurred as a result of a **Claim** first made against the **Insured** during the **Policy Period** or the Extended Reporting Period, if applicable, and reported to the Company pursuant to Paragraph **A.** Claim Reporting Provision of Section **VIII** – Claims Reporting And Notice by reason of a violation of the Fair Credit Reporting Act (FCRA) and amendments thereto or any similar or related federal, state, or local statute, law, rule, ordinance, or regulation, including the Fair and Accurate Credit Transactions Act of 2003 (FACTA) in the performance of **Professional Services** rendered or that should have been rendered by the **Insured**, provided:

**a.** The FCRA violation happens during the **Policy Period** or on or after the applicable **Retroactive Date** and before the end of the **Policy Period**; and

**b.** Prior to the effective date of this Coverage Part, no **Insured** had any knowledge of such violation, or any fact, circumstance, situation, or incident which would lead a reasonable person in the **Insured's** position to conclude that a **Claim** was likely.

No coverage for FCRA Violations is provided by this Policy except as provided by this Paragraph **B.2.** FCRA Violation of Section **II** – Insuring Agreements.

3. **Sexual Injury**

The Company shall pay those **Claim Expenses** incurred as a result of a **Claim** for **Sexual Injury** in excess of the Deductible stated in the Declarations and up to the Sexual Injury Limit Of Liability stated in the Declarations, per **Policy Period** including the Extended Reporting Period, if applicable, as a result of all **Sexual Acts** perpetrated or alleged to have been perpetrated by any **Insured** or for allegations that the **Insured** was negligent in hiring, training, or supervising any **Insured** who perpetrated or is alleged to have perpetrated a **Sexual Act** resulting in **Sexual Injury** provided:

**a.** Such **Sexual Act** is perpetrated or alleged to have been perpetrated during the **Policy Period** or on or after the **Retroactive Date** and before the end of the **Policy Period**; and

**b.** Prior to the effective date of this Policy, no **Insured** had any knowledge of such **Sexual Act** or any fact, circumstance, situation, or incident involving such **Sexual Act** which would lead a reasonable person in that **Insured's** position to conclude that a **Claim** was likely.

However, this Additional Payment does not apply to any:

**(1)** **Insured** who perpetrates or is alleged to have perpetrated a **Sexual Act** resulting in **Sexual Injury**; however, the Company will defend such **Insured**, and pay **Claim Expenses** on such **Insured's** behalf, until it is established that such **Insured in fact** perpetrated such **Sexual Act**;

**(2)** Manager, supervisor, partner, officer, director, or trustee who gains knowledge of any actual or alleged **Sexual Act** and fails to take reasonable care to prevent a future **Sexual Act**;

**(3)** **Claim** based upon, arising out of, or in any way involving any **Sexual Act** which is perpetrated or alleged to have been perpetrated by an **Insured** who previously perpetrated or is alleged to have previously perpetrated a **Sexual Act**, and after a manager, supervisor, partner, officer, director, or trustee has gained knowledge of the actual or alleged previously perpetrated **Sexual Act**; or

**(4)** **Claim** based upon, arising out of, or in any way involving any **Sexual Injury** to an **Insured**.

No coverage for **Sexual Injury** is provided by this Policy except as provided by this Paragraph **B.3.** Sexual Injury of Section **II** – Insuring Agreements.

**4. Third Party Discrimination**

The Company shall pay those sums in excess of the Deductible stated in the Declaration up to the Third Party Discrimination Limit Of Liability stated in the Declarations, per **Policy Period** including the Extended Reporting Period, if applicable, which the **Insured** becomes legally obligated to pay as **Damages** and **Claim Expenses** incurred as a result of a **Claim** for **Third Party Discrimination**; provided:

**a.** The **Third Party Discrimination** happens during the **Policy Period** or on or after the **Retroactive Date** and before the end of the **Policy Period**; and

**b.** Prior to the effective date of this Policy, no **Insured** had any knowledge of such **Third Party Discrimination** or any fact, circumstance, situation or incident which would lead a reasonable person in that **Insured's** position to conclude that a **Claim** for **Third Party Discrimination** was likely.

No coverage for **Third Party Discrimination** is provided by this Policy except as provided by this Paragraph **B.4.** Third Party Discrimination of Section **II** – Insuring Agreements.

Payments under this Paragraph **B.** shall be a part of, and not in addition to, the Coverage Part Aggregate Limit Of Liability stated in the Declarations. Once the applicable limit has been paid, the Company's obligation to defend has ended.

**C. Supplementary Payments**

**1. Disciplinary Proceeding Legal Fee And Legal Expense Reimbursement**

**a.** Upon submission to the Company of satisfactory written proof of payment by the Named Insured, the Company shall reimburse the Named Insured up to the Disciplinary Proceeding Limit Of Liability stated in the Declarations, per **Policy Period** including the Extended Reporting Period, if applicable, for all reasonable and necessary legal fees and legal expenses incurred in response to a **Disciplinary Proceeding** against the Named Insured first initiated during the **Policy Period**, or the Extended Reporting Period, if applicable, provided:

**(1)** The **Wrongful Act** giving rise to the **Disciplinary Proceeding** happens during the **Policy Period** or on or after the **Retroactive Date** and before the end of the **Policy Period**; and

**(2)** Prior to the effective date of this Coverage Part no **Insured** had any knowledge of such **Wrongful Act** or any fact, circumstance, situation, or incident which may have led a reasonable person in the **Insured's** position to conclude that a **Disciplinary Proceeding** was likely.

**b.** The **Insured** will give the Company written notice as soon as practicable of any **Disciplinary Proceeding** first initiated against the **Insured** during the **Policy Period** or the Extended Reporting Period, if applicable. In any event, such **Disciplinary Proceeding** must be reported to the address stated in the Claim Reporting policyholder notice, no later than 60 days after the end of the **Policy Period** or the Extended Reporting Period, if applicable.

**c.** No reimbursement shall be made for the **Insured's** payment of any taxes; criminal or civil fines, penalties or sanctions; registration or licensing fees; or any monetary judgment, award, or settlement of any kind.

**d.** Reimbursement to the Named Insured under this Paragraph **C.1.** shall be in addition to the Limits Of Liability stated in the Declarations and will not be subject to the Deductible.

**2. Loss Of Earnings And Expense Reimbursement**

**a.** Upon submission to the Company of satisfactory written proof of payment by the Named Insured, the Company shall reimburse the Named Insured as expense reimbursement for all reasonable and necessary expenses incurred by an **Insured** at the Company's written request for attendance at any arbitration, **Mediation**, deposition, hearing, or trial in connection with a **Claim** to which this Coverage Part applies. The

Named Insured will give the Company written proof of payment of expenses as soon as practicable. In any event, such written proof of payment must be reported to the Company at the address stated in the Claim Reporting policyholder notice attached to this Policy, no later than 60 days after incurring such expenses.

**b.** The Company shall compensate the Named Insured for loss of earnings of an **Insured** up to the Loss Of Earnings And Expense Reimbursement Limits Of Liability stated in the Declarations per day for all **Insureds** to attend at the Company's written request any arbitration, **Mediation**, deposition, hearing, or trial in connection with a **Claim** to which this Coverage Part applies.

**c.** The maximum the Company shall pay the Named Insured for all **Insureds** for compensation of all loss of earnings and expense reimbursement for all **Claims** to which this Coverage Part applies and all attendances at the Company's written request is the Loss Of Earnings And Expense Reimbursement Limit Of Liability stated in the Declarations.

**d.** Payments to the Named Insured under this Paragraph **C.2.** shall be in addition to the Limits Of Liability stated in the Declarations and will not be subject to the Deductible.

No coverage for Loss Of Earnings And Expense Reimbursement is provided by this Policy except as provided by this Paragraph **C.2.** Loss Of Earnings And Expense Reimbursement of Section **II** – Insuring Agreements.

**3. Pre-Claim Investigation Expenses**

If, during the **Policy Period**, the **Insured** provides the Company with written notice of a **Wrongful Act** or **Personal Injury** as provided in Paragraph **B.** Discovery Of Potential Claims of Section **VIII** – Claims Reporting And Notice that is reasonably expected to result in a **Claim** but as to which no **Claim** has yet been made, the Company may, at the Company's sole option, choose to investigate the **Wrongful Act** or **Personal Injury**. Such an investigation will be at the Company's expense and will not reduce the Limits Of Liability or be subject to the Deductible provisions of this Policy until one of the following occurs:

**a.** A **Claim** results from the **Wrongful Act** or **Personal Injury** under investigation; or

**b.** The Company incurs the Pre-Claim Investigation Expenses Limit Of Liability stated in the Declarations in expenses arising from the investigation.

If a **Claim** is made and reported to the Company, or once the Company incurs the Pre-Claim Investigation Expenses Limit Of Liability stated in the Declarations in investigative expense, any further payment will be considered **Claims Expense** and will reduce the applicable Limits Of Liability and be subject to the Deductible provisions of this insurance.

No coverage for **Pre-Claim Investigation Expenses** is provided by this Policy except as provided by this Paragraph **C.3.** Pre-Claim Investigation Expenses of Section **II** – Insuring Agreements.

**4. Public Relations Expenses**

The Company shall reimburse **Public Relations Expenses** that have been approved by the Company prior to being incurred, up to the Public Relations Expenses Limit Of Liability stated in the Declarations, per **Policy Period** including the Extended Reporting Period, if applicable, as the direct result of a **Wrongful Act** or **Personal Injury** that occurs during the **Policy Period**.

No coverage for **Public Relations Expenses** is provided by this Policy except as provided by this Paragraph **C.4.** Public Relations Expenses of Section **II** – Insuring Agreements.

**5. Subpoena And Record Request Assistance**

In the event that during the **Policy Period**:

**a.** The **Insured** first receives a subpoena, notice of deposition, or a written request for the **Insured's** records or files relative to a **Wrongful Act** or **Personal Injury** in the performance of **Professional Services** rendered or that should have been rendered by the **Insured** or by any person or organization for whose **Wrongful Act** or **Personal Injury** the **Insured** is legally responsible; **and**

**b.** The **Insured** reports the receipt of such subpoena or request in writing to the Company within 30 days of such receipt and prior to a **Claim** being first made against the **Insured** arising out of such **Wrongful Act** or **Personal Injury**;

then the Company shall pay on behalf of the **Insured** up to the Subpoena And Record Request Assistance Limit Of Liability stated in the Declarations per **Policy Period** reasonable and necessary legal fees and legal expenses

incurred for engaging the services of legal counsel selected by the Company to assist the **Insured** in responding to such subpoena or request.

Payments to the Named Insured under this Paragraph **C.5.** shall be in addition to the Coverage Part Aggregate Limit Of Liability stated in the Declarations and not subject to the Deductible.

## SECTION III – DEFINITIONS

**A. Application** means:

**1.** The application for this Policy and for any policy issued by the Company, or any of its affiliates, of which this Policy is a direct or indirect renewal or replacement;

**2.** Any attachment to any such application; and

**3.** Any other materials or applications submitted with or incorporated into any such application.

**B. Bodily Injury** means bodily injury, sickness, or disease sustained by a person, including death resulting from any of these; however, **Bodily Injury** shall not include:

**1.** Humiliation or the infliction of emotional distress arising solely from **Personal Injury**; or

**2. Sexual Injury**.

**C. Claim** means the **Insured's** receipt of:

**1.** A written demand for **Damages** or remedial **Professional Services**, including a written demand that the **Insured** toll or waive a statute of limitations; or

**2.** The service of suit or institution of arbitration proceedings against the **Insured**;

however, **Claim** shall not include any **Disciplinary Proceeding**.

**D. Claim Expenses** means reasonable and necessary amounts incurred by the Company, or by the **Insured** with the prior written consent of the Company, in the defense of that portion of any **Claim** for which coverage is afforded under this Coverage Part, including costs of investigation, court costs, costs of appeals, and costs of bonds to release attachments and similar bonds, but without any obligation of the Company to apply for or furnish any such bonds; however, **Claim Expenses** shall not include:

**1.** Salary, wages, overhead, or benefit expenses of or associated with employees or officials of the Named Insured or employees or officials of the Company; or

**2.** Salary, wages, administration, overhead, benefit expenses, or charges of any kind attributable to any in-house counsel or outside counsel for the Named Insured or the Company.

**E. Client** means a natural person or organization:

**1.** For which **Professional Services** are rendered by the **Insured**; or

**2.** Using the Named Insured's products or goods for which a fee was paid to the Named Insured.

**F. Computer System** means:

**1.** Any computer hardware, firmware, software, or any components thereof; and

**2.** The data stored thereon wherever located, associated input and output devices, data storage devices and repositories, networking equipment, backup facilities, and websites;

that are under the ownership, operation, or control of, or that is contracted or leased by, the Named Insured.

**G. Content** means advertising, publicity, press release, articles, publication, marketing or promotional item, or broadcast by any medium.

**H. Damages** means the monetary portion of any judgment, award, or settlement, including punitive damages where insurable by law; however, **Damages** shall not include:

**1.** Multiplied portions of damages in excess of actual damages, including trebling of damages;

**2.** The cost of any modifications or changes to the **Insured's** security measures, procedures, software, or hardware required or agreed to by the **Insured** to satisfy a judgment, award, or settlement;

3. Any cost required to repair, build, or modify property to comply with any award by a court, administrative order, arbitration award, or any similar judgment;

4. Taxes, criminal or civil fines assessed against an **Insured**, attorneys' fees of a party other than an **Insured**, or penalties imposed by law;

5. Sanctions;

6. Matters which are uninsurable under the law pursuant to which this Coverage Part will be construed;

7. The return, withdrawal, reduction, restitution, or payment of any fees, profits, charges or royalties for services or considerations, or any expenses paid or payable to the **Insured** for services or goods; or

8. Any cost to correct, perform, or re-perform services of a professional nature when the **Insured** had the capability to correct, perform, or re-perform the services of a professional nature with respect to which such costs were incurred.

The insurability of such punitive damages will be determined under the internal laws of any applicable jurisdiction most favorable to the **Insured**, including without limitation the jurisdiction in which the Named Insured, the **Insured**, the Company, this Policy, or such **Claim** is located.

**I.** **Denial Of Service Attack** means any unlawful or unauthorized attempt by a third party to temporarily or indefinitely overload, hinder, interrupt, or suspend service to a **Computer System** via the internet.

**J.** **Disciplinary Proceeding** means the **Insured's** receipt of any proceeding by a United States of America domiciled regulatory body, disciplinary board, or governmental agency, any of which has the authority to investigate charges of professional misconduct in the performance of **Professional Services**; however, **Disciplinary Proceeding** will not include any criminal proceeding.

**K.** **Domestic Partner** means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state, or local law.

**L.** **Electronic Data** means information, facts, or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices, or other media which are used with electronically controlled equipment.

**M.** **Financial Planner** means an investment professional who helps individuals or entities set and achieve their financial goals through investments, tax planning, asset allocation, risk management, retirement planning, and estate planning, and  assisting in increasing net worth in furtherance of the individual's or entity's financial objectives.

**N.** **Interrelated Wrongful Act** means any **Wrongful Acts** that have as a common connection or nexus any fact, incident, circumstance, situation, event, transaction, or cause or series of facts, incidents, circumstances, situations, events, transactions, or causes.

**O.** **Media Offense** means any of the following acts, errors, or omissions by the **Insured** in its dissemination of **Content** for which the Named Insured is legally responsible:

1. Libel, slander, or defamation, or any other form of disparagement;

2. Invasion or infringement of the right of privacy or the right of publicity;

3. Improper deep-linking, framing, web harvesting, web scraping, or data extraction;

4. Infringement of copyright, service mark, service name, trademark, title, trade dress, trade name, or slogan, and unfair competition alleged in connection therewith;

5. Plagiarism, piracy, or misappropriation of ideas under implied contract; or

6. Infliction of emotional distress, mental anguish, false arrest, or malicious prosecution.

**P.** **Mediation** means the voluntary process in which an objective third party who is a qualified professional mediator selected by the parties to the **Claim**, with written agreement of the Company, intervenes between the parties in an attempt to achieve settlement of the **Claim**. However, **Mediation** does not include litigation, arbitration, or any court-mandated proceeding.

**Q.** **Personal Injury** means:

1. Libel, slander, or defamation;

2. Invasion or infringement of the right of privacy or right of publicity;

    **3.**  Malicious prosecution, abuse of process, false arrest, or false imprisonment; or

    **4.**  Humiliation or infliction of emotional distress;

committed in the performance of **Professional Services**.

**R.**  **Policy Period** means the period from the inception date of this Coverage Part to the Coverage Part expiration date stated in the Declarations, or the effective date of any earlier cancellation or termination of this Policy.

**S.**  **Pollutant** means any solid, liquid, gaseous, fuel, lubricant, thermal, acoustic, electrical, or magnetic irritant or contaminant, including, but not limited to, smoke, vapor, soot, fumes, fibers, radiation, acid, alkalis, petroleum, chemicals, or waste. Waste includes medical waste and all other materials to be disposed of, recycled, stored, reconditioned, or reclaimed.

**T.**  **Pre-Claim Investigation Expenses** means costs, attorneys' fees, experts' fees, charges, or expenses incurred by the Company, at our discretion, in connection with the investigation or evaluation of any potential **Claim**.

**U.**  **Predecessor Entity** means any entity engaged in **Professional Services** to whose financial assets and liabilities the Named Insured is the majority successor in interest.

**V.**  **Private Data** means data in the care, custody, and control of an **Insured** or for which the Named Insured is legally responsible, containing any of the following:

    **1.**  An individual's driver license or other state-issued identification number, social security number, unpublished telephone number, or savings account, checking account, credit card, or debit card number;

    **2.**  Nonpublic personal information as defined in the Gramm-Leach-Bliley Act of 1999, as amended, and regulations issued pursuant thereto;

    **3.**  Medical and healthcare information, including protected health information as defined in the Health Insurance Portability and Accountability Act of 1996 (HIPAA), as amended, and regulations issued pursuant thereto;

    **4.**  Private personal information as defined under a security breach notice law;

    **5.**  Private personal information as defined under the law of a country other than the United States, which law is intended to provide for the protection of such private personal information; or

    **6.**  Proprietary information of third parties of commercial value which the Named Insured is legally responsible to maintain in confidence;

not including any data available to or accessible by the general public.

**W.**  **Professional Services** means those services stated in the Declarations rendered for others for a fee.

**X.**  **Property Damage** means physical injury to tangible property, including all resulting loss of use of that property or loss of use of tangible property that is not physically injured; however, tangible property shall not include **Electronic Data**.

**Y.**  **Public Relations Expenses** means actual, necessary, and reasonable expenses approved by the Company in writing and incurred by the **Insured** in retaining a public relations consultant to protect or restore the **Insured's** business reputation or in planning, implementing, executing, and managing a public relations campaign under the direction of a public relations consultant to mitigate or minimize any actual or anticipated adverse effects of negative publicity.

**Z.**  **Retroactive Date** means the Retroactive Date stated in the Declarations as applicable to the coverages under the Professional Liability Insurance Coverage Part.

**AA.** **Sexual Act** means sexual abuse, sexual molestation, or sexual exploitation arising out of the conduct of **Professional Services**.

**BB.** **Sexual Injury** means bodily injury, sickness, disease, unlawful detention, false imprisonment, humiliation, emotional distress, mental anguish, sexual dysfunction, invasion of right of privacy, assault, or battery, solely when arising out of a **Sexual Act**.

**CC.** **Subsidiary** means:

    **1.**  Any entity, excluding partnerships or joint ventures, of which the **Insured** owns more than 50% of the outstanding voting securities or has the right to exercise more than 50% of the voting rights for the election or appointment of the members of the board of directors or equivalent management positions including, but not limited to, members of the board of managers of a limited liability company;

2.  Any entity that is newly created or acquired during the **Policy Period**, provided that such entity's total consolidated assets as of the date of such creation or acquisition will be no more than 25% of the total consolidated assets of the **Insured** according to the most recently filed audited financial statements. A newly created or acquired **Subsidiary** will only receive coverage for **Claims** arising from **Wrongful Acts**, **Personal Injuries**, or **Interrelated Wrongful Acts** occurring after such date of creation or acquisition and before the end of the **Policy Period**; or

3.  Any organization operated as a joint venture in which, on or prior to the inception date stated in the Declarations, the **Insured** owns, directly or through one or more **Subsidiaries**, exactly 50% of the organization's outstanding securities with voting rights, and under a written agreement with the organization's remaining owners, has sole control of the organization's management and operations.

DD. **Third Party Discrimination** means conduct of an **Insured** with respect to any natural person who is not an **Insured** that results in any actual or alleged discrimination on the basis of age, color, disability, familial status, marital status, national origin, pregnancy, race, sex, sexual preference, religion, or other protected class or characteristic under applicable federal, state, or local statute or ordinance.

EE. **Unauthorized Access** means a breach of a **Computer System**, including:

1.  Any intentional violation, interception, use, or misuse of a **Computer System**, whether or not for profit or gain, by any person without the permission, knowledge, or ratification of the **Insured**;

2.  Access to a **Computer System** with the **Insured's** permission, where such permission is the result of fraud or deception, including phishing scams;

3.  Use of a **Computer System** by a party including, but not limited to, a rogue employee, authorized by the **Insured** to use such system, who does so for an unauthorized purpose;

4.  The introduction of viruses, malware, or other programs into a **Computer System** which contain fraudulent or destructive instructions or code, including any inadvertent transmission of such programs to a third party;

5.  A credible threat by a third party including, but not limited to, a threat to initiate ransomware or a **Denial Of Service Attack**, threatening or portending:

    a.  Loss or damage to **Private Data**;

    b.  Loss or damage to a **Computer System**; or

    c.  Loss of money, securities, bonds, or any similar financial instrument of the Named Insured, solely to the extent that record of such is maintained in digital or electronic format on a **Computer System**; or

6.  A **Denial Of Service Attack** or the failure to prevent an unauthorized user or code from launching a **Denial Of Service Attack** on a third party through a **Computer System**.

FF. **Unintentional Data Compromise** means:

1.  Any computer security incident, including by an **Unauthorized Access**, resulting in the intrusion, breach, compromise, theft, loss, or misuse of **Private Data**;

2.  The theft or loss of any paper records containing **Private Data**;

3.  The failure of any third party to prevent the unauthorized viewing, copying, or distribution of **Private Data** which the Named Insured has entrusted to such party under a written contract or agreement that specifically requires such party to protect the confidentiality of the **Private Data** so entrusted; or

4.  The unintentional breach of the Named Insured's written privacy policy.

GG. **Wrongful Act** means a negligent act, error, or omission in **Professional Services** rendered or that should have been rendered by the **Insured** or by any person for whose acts, errors, or omissions the **Insured** is legally responsible, and includes an **Interrelated Wrongful Act**.

**SECTION IV – EXCLUSIONS**

With respect to all Coverages under this Coverage Part, this Coverage Part does not apply to any **Claim**, Additional Payment, or Supplementary Payment:

A.  **Abuse**

Based upon or arising out of any actual or threatened abuse, molestation, or exploitation by anyone; however, this exclusion does not apply to coverage provided under Paragraph **B.3.** Sexual Injury of Section **II** – Insuring Agreement.

**B. Any Information In Application**

Based upon or arising out of any **Wrongful Act** or **Personal Injury**, or any fact, circumstance, situation, incident, or **Claim**, referred to in an answer to any question of the **Application(s)** or addendum(s) attached to this Policy.

**C. Bodily Injury**

Based upon or arising out of any actual or alleged **Bodily Injury**; however, this exclusion shall not apply to coverage provided under Paragraph **B.3.** Sexual Injury of Section **II** – Insuring Agreement.

**D. Contractual Liability**

Based upon or arising out of the liability of others assumed by the **Insured** under any contract or agreement; however, this exclusion shall not apply to any liability an **Insured** would have in the absence of the contract or agreement by reason of a **Wrongful Act** of the **Insured** in the performance of **Professional Services**.

**E. Conversion Or Misappropriation**

Based upon or arising out of any conversion, misappropriation, commingling, or defalcation of funds or property.

**F. Employment Related Practices**

Based upon or arising out of:

1. Any obligation of the **Insured** under any workers' compensation, unemployment compensation, or disability benefits law or under any similar law; or

2. Wrongful termination or other employment related practices; including, but not limited to, the employment relationship or the nature, terms or conditions of employment or any workplace tort brought by or on behalf of any employee, former employee, prospective employee, independent contractor, or consultant of the **Insured**.

**G. ERISA Or SEC**

Based upon or arising out of any actual or alleged violation of the responsibilities, obligations, or duties imposed by:

1. The Employment Retirement Income Security Act (ERISA) of 1974 and any amendments thereto, or any rules or regulations promulgated thereunder; or

2. Any of the provisions of the Securities Act of 1933, the Securities Exchange Act (SEC) of 1934, or any similar federal, state, or common law relating thereto.

**H. Failure To Pay Or Collect**

Based upon or arising out of any inability or failure of any party to pay or collect monies or to collect or pay federal, state, county, or local tax, including, but not limited to, income tax, sales tax, or property tax.

**I. Fraudulent Or Dishonest Acts**

Based upon, arising out of, or in any way involving any conduct of the **Insured** or at the **Insured's** direction that is intentional, willful, dishonest, fraudulent, or that constitutes a willful violation of any law, statute, or regulation; however, this exclusion will not apply to:

1. The strictly vicarious liability of any **Insured** for the intentional, willful, dishonest, or fraudulent conduct of another **Insured** or for the conduct of another **Insured** that constitutes a willful violation of any statute or regulation; or

2. **Claim Expenses** incurred until an allegation is determined through final and non-appealable adjudication.

**J. Illegal Profit**

Based upon, arising out of, or in any way involving the gaining by any **Insured** of any profit, remuneration, or advantage to which such **Insured** was not legally entitled, provided; however, no fact pertaining to any **Insured** will be imputed to any other **Insured** to determine the applicability of this exclusion.

**K. Insolvency**

Based upon or arising out of the insolvency, receivership, bankruptcy, liquidation, or financial inability to pay:

**App. 24**

1.  Of any bank, savings and loan, banking firm, registered representative or broker/dealer of securities or commodities, insurance company, reinsurer, risk retention group or captive (or other self-insurance plan or trust by whatsoever name), real estate developer, or construction organization; or

2.  Of any **Subsidiary**.

L.  **Insured Versus Insured**

Made against the **Insured**:

1.  By any principal, partner, officer, director, member, manager, employee, or shareholder of an **Insured** or any subrogee or assignee of such person; or

2.  By or on behalf of any person or organization included in the definition of **Insured.**

M.  **Investment Advising Services**

Based upon or arising out of any acts or services as an investment adviser, **Financial Planner**, registered representative or broker/dealer of securities or commodities, mortgage banker, or investment banker.

N.  **Media Offense**

Based upon or arising out of any **Media Offense**.

O.  **Not Licensed As Required By Law**

Based upon or arising out of any acts or services performed by any **Insured** that is not licensed or certified to perform such acts or services if such licensing or certification is required by law.

P.  **Other Coverage**

Brought under any other Coverage Part of this Policy.

Q.  **Owned Or Controlled Entities**

Made against the **Insured** by any person or organization or its subrogee, assignee, contractor, subcontractor, or parent organization, **Subsidiary**, division, or affiliated organization which was or is operated, managed, owned, or otherwise controlled, whether directly or indirectly, or in whole or in part, by any **Insured**.

R.  **Patents Or Trade Secrets**

Based upon or arising out of:

1.  Infringement or inducement of infringement of patent or trade secret or misappropriation of trade secrets or confidential or proprietary information relating to the Named Insured's business operations;

2.  Unfair competition based upon infringement of copyright, patent, trademark, service mark, trade name, or trade secret;

3.  The value of trade secrets, confidential processing methods, or other confidential or proprietary information; or

4.  Any dispute related to ownership of any intellectual property.

S.  **Pollution**

Based upon or arising out of:

1.  Actual, alleged, or threatened discharge, disposal, migration, dispersal, release, or escape of **Pollutants**; or

2.  Direction, order, or request to test for, monitor, remediate, clean up, remove, contain, treat, detoxify, or neutralize **Pollutants**, or to pay for or contribute to the costs of undertaking such actions.

T.  **Prior Notice**

Based upon or arising out of any **Wrongful Act** or **Personal Injury** or any fact, circumstance, or situation that has been the subject of any notice given prior to the **Policy Period** under any other policy of insurance or to any reinsurer, risk retention group or captive (or any other self-insurance plan or trust by whatsoever name), or insurance representative;

U.  **Property Damage**

Based upon or arising out of any actual or alleged **Property Damage**.

**V. Trade Practices And Antitrust**

Based upon or arising out of any actual or alleged violation of any law, whether statutory, regulatory, or common law, respecting any of the following activities: antitrust, business competition, unfair trade practices, or tortious interference in another's business or contractual relationships.

**W. Unauthorized Access**

Based upon or arising out of an **Unauthorized Access**.

**X. Unintentional Data Compromise**

Based upon or arising out of any actual or alleged **Unintentional Data Compromise**.

**Y. Unlawful Discrimination**

Based upon or arising out of any unlawful discrimination by any **Insured**; however, this exclusion does not apply to:

**1.** Such unlawful discrimination resulting directly from and in the normal course of the performance of **Professional Services** by the **Insured**; or

**2.** Coverage provided under Paragraph **B.4.** Third Party Discrimination of Section **II** – Insuring Agreement.

**Z. Valuable Consideration**

Based upon or arising out of any actual or alleged price discounts, prizes, awards, money, or valuable consideration given in excess of a total contracted or expected amount.

**AA. Warranties Or Guarantees**

Based upon or arising out of any warranties or guarantees, whether express, implied, or otherwise; or any cost estimates.

## SECTION V – TERRITORY

The insurance afforded by this Coverage Part applies worldwide, except for **Claims** made in any country on which the government of the United States of America has imposed trade sanctions, embargoes, or any similar regulations that prohibit the transaction of business with or within such country.

## SECTION VI – LIMITS OF LIABILITY, DEDUCTIBLES, AND INTERRELATED WRONGFUL ACTS

**A. Limits Of Liability**

**1. Each Claim**

Subject to Paragraphs **2.** and **3.** below, the liability of the Company for the combined total of **Damages** and **Claim Expenses** paid under Section **II** – Insuring Agreements, **A.** Professional Liability Coverage for each **Claim** first made against the **Insured** during the **Policy Period** or Extended Reporting Period, if applicable, and reported to the Company pursuant to Paragraph **A.** Claim Reporting Provision of Section **VIII** – Claims Reporting And Notice, shall not exceed the Each Claim Limit Of Liability stated in the Declarations.

**2. Aggregate**

Subject to Paragraph **3.** below, the total liability of the Company for the combined total of all **Damages** and **Claim Expenses** paid under Section **II** – Insuring Agreements, **A.** Professional Liability Coverage arising out of all **Claims** first made against the **Insured** during the **Policy Period** and the Extended Reporting Period, if applicable, shall not exceed the Aggregate Limit Of Liability stated in the Declarations.

**3. Coverage Part Aggregate**

The total liability of the Company for the combined total of all **Damages** and **Claim Expenses** paid under Section **II** – Insuring Agreements, **A.** Professional Liability Coverage and **B.** Additional Payments arising out of all **Claims** first made against the **Insured** during the **Policy Period** and the Extended Reporting Period, if applicable, shall not exceed the Coverage Part Aggregate Limit Of Liability stated in the Declarations.

**B. Deductibles**

**1. Each Claim Deductible**

Subject to Paragraph **2.** below, the applicable Deductible stated in the Declarations shall be paid by the Named Insured for each **Claim** and apply to **Damages** and **Claim Expenses**, whether or not any **Damages** payments

are made. Such Deductible amounts will, upon written demand by the Company, be paid by the Named Insured within 10 days. The total payments requested from the Named Insured in respect of each **Claim** will not exceed the Deductible stated in the Declarations. The determination of the Company as to the reasonableness of the **Claim Expenses** shall be conclusive on the Named Insured.

**2. Aggregate Deductible**

The total Deductible payments to be paid by the Named Insured shall not exceed the Aggregate Deductible stated in the Declarations for **Damages** and **Claim Expenses** arising out of all **Claims**, other than any **Disciplinary Proceeding**, first made during the **Policy Period** and the Extended Reporting Period, if applicable.

**3. Deductible Credits**

With respect to this Coverage Part, if a **Claim** is settled without litigation, arbitration, **Mediation** or court mandated proceedings, the Deductible for such **Claim** will be reduced by 75% or $10,000, whichever is less.

If the Named Insured and the Company agree to the use of **Mediation** and a **Claim** is settled at that **Mediation**, the Deductible for such **Claim** will be reduced by 50% or $10,000, whichever is less.

The deductible credits are not additive or cumulative.

**C. Multiple Insureds, Claims, And Claimants**

The inclusion herein of more than one **Insured** in any **Claim** or the making of **Claims** by more than one person or organization shall not operate to increase the Limits Of Liability stated in the Declarations. More than one **Claim** arising out of a single **Wrongful Act, Personal Injury**, or **Interrelated Wrongful Act** will be treated as a single **Claim**. Such single **Claim** will be deemed first made on the date on which the earliest **Claim** arising out of such **Wrongful Act**, **Personal Injury**, or **Interrelated Wrongful Act** is made or with respect to written notice given to and accepted by the Company pursuant to Paragraph **B.** Discovery Of Potential Claims of Section **VIII** – Claims Reporting And Notice, on the date within the **Policy Period** on which such written notice of potential **Claim** is first received by the Company.

**SECTION VII – DEFENSE, SETTLEMENTS AND CLAIM EXPENSES**

**A. Defense And Investigation**

With respect to coverage hereunder, the Company will have the right and duty to defend the **Insured** and to investigate any **Claim** and **Disciplinary Proceeding** to which coverage under this Coverage Part applies pursuant to the following provisions:

**1. Claim Expenses** incurred in defending and investigating such **Claim** shall be a part of and not in addition to the applicable Limits Of Liability stated in the Declarations. Such **Claim Expenses** will reduce the applicable Limits of Liability and will be applied against the applicable Deductible. The Company will have no obligation to pay any **Damages** or to defend or continue to defend any **Claim** or to pay **Claim Expenses** after the applicable Limits Of Liability stated in the Declarations have been exhausted by payment(s) of **Damages** or **Claim Expenses**.

**2.** The Company shall select defense counsel; however, if the law of the state of the Named Insured's domicile, stated in the Declarations, allows the **Insured** to control the selection of defense counsel where a conflict of interest has arisen between the **Insured** and the Company, the Company will provide a list of attorneys or law firms from which the **Insured** may designate defense counsel who will act solely in the interest of the **Insured**, and the **Insured** will direct such defense counsel to cooperate with the Company. Such cooperation shall include:

**a.** Providing on a regular basis, but not less frequently than every 3 months, written reports on claimed **Damages**, potential liability, progress of any litigation, any settlement demands, or any investigation developments that materially affect the **Claim**;

**b.** Providing any other reasonable information requested;

**c.** Providing fully itemized billing on a periodic basis; and

**d.** Cooperating with the Company and the **Insured** in resolving any disputes, including but not limited to billing disputes.

The fees and costs incurred by such defense counsel, including those fees and costs generated by cooperation with the Company, as set forth above, will be included in **Claim Expenses**. Such **Claim Expenses** shall be a part of and not in addition to the applicable Limits Of Liability stated in the Declarations. Such **Claim Expenses** shall reduce the applicable Limits Of Liability and be applied against the applicable Deductible.

3. Any payments shall be made in U.S. currency from a bank or financial institution located in the United States of America. With respect to **Claims** brought in a country other than the United States of America, payment will be made to the Named Insured.

**B. Consent To Settlement**

The Company will not settle any **Claim** without the prior written consent of the first Named Insured, but the Company will have, at all times, the right to recommend a settlement of any **Claim**. If the first Named Insured refuses to settle such **Claim** pursuant to the Company's recommendations and acceptable to the claimant, then the Company's liability in regard to such **Claim** will not exceed the sum of:

1. The amount of **Damages** for which the Company could have settled such **Claim**;

2. **Claim Expenses** accrued as of the date such settlement was proposed in writing by the Company to the Named Insured; and

3. 80% of all covered **Damages** and **Claim Expenses** incurred thereafter on account of such **Claim**.

Such amounts are subject to the provisions of Paragraph **A**.

**SECTION VIII – CLAIMS REPORTING AND NOTICE**

**A. Claim Reporting Provision**

1. It is a condition precedent to coverage afforded by this Coverage Part that the **Insured** shall give to the Company written notice as soon as practicable of any **Claim** first made against the **Insured** during the **Policy Period** or the Extended Reporting Period, if applicable, but in no event later than:

   a. 60 days after expiration of the **Policy Period**; or

   b. The expiration of the Extended Reporting Period, if applicable.

   Such **Claim** must be reported to the Company at the address stated on the Claim Reporting policyholder notice attached to this Policy.

2. In the event a suit is brought against the **Insured**, the **Insured** will immediately forward to the Company at the address stated on the Claim Reporting policyholder notice, every demand, notice, summons, or other process received by the **Insured** or their representatives.

**B. Discovery Of Potential Claims**

If, during the **Policy Period**, the **Insured** first becomes aware of a specific **Wrongful Act** or **Personal Injury** which is reasonably expected to result in a **Claim** within the scope of coverage of this Coverage Part, then the **Insured** may elect to provide notice of a potential claim to the Company. Such notice to the Company shall be in writing, containing the information listed below, and sent to the Company at the address stated on the Claim Reporting policyholder notice. If such written notice is received by the Company during the **Policy Period**, then any **Claim** subsequently made against the **Insured** arising out of such **Wrongful Act** or **Personal Injury** will be deemed for the purpose of this insurance to have been first made on the date on which such written notice is first received by the Company.

It is a condition precedent to the coverage afforded by this Paragraph **B.** that written notice is given to the Company containing the following information:

1. The description of the specific **Wrongful Act** or **Personal Injury**;

2. The date on which such **Wrongful Act** or **Personal Injury** took place;

3. The **Damage** or injury which has or may result from such **Wrongful Act** or **Personal Injury**;

4. The identity of any injured person or organization subject to such injury or **Damage**; and

5. The date and circumstances by which the **Insured** first became aware of such **Wrongful Act** or **Personal Injury**.

The Company, at its sole option, may investigate such circumstance, **Wrongful Act** or **Personal Injury** as stated in Paragraph **C.3.** Pre-Claim Investigation Expenses of Section **II** – Insuring Agreement.

**C. Supplementary Payments**

Pursuant to Paragraph **C.** Supplementary Payments of Section **II** – Insuring Agreements, upon the Company's receipt of satisfactory written proof of payment by the Named Insured in no event later than 60 days after the date incurred, the Company will indemnify the Named Insured for such expenses and such loss of earnings within 60 days.

**SECTION IX – EXTENDED REPORTING PERIOD**

**A.**  The Named Insured's right to exercise the Extended Reporting Period under this Coverage Part will exist solely if the Named Insured also exercises its right to purchase the Extended Reporting Period under all Insuring Agreements of all Coverage Parts in the Policy for which an Extended Reporting Period is available.

**B.**  If the Named Insured nonrenews this Policy in its entirety or cancels this Policy in its entirety pursuant to Paragraph **D.** Cancellation of the **COMMON POLICY CONDITIONS**, or if the Company nonrenews this Policy or cancels this Policy pursuant to Paragraph **D.** Cancellation of the **COMMON POLICY CONDITIONS**, for reasons other than nonpayment of premium or Deductible or non-compliance with the terms and conditions of this Policy, then the Named Insured will have the right upon payment of an additional premium calculated at the Premium Percentage stated in the Declarations of the annual premium for the **Policy Period** to extend the coverage granted under Section **II** – Insuring Agreements of this Coverage Part for the Additional Period stated in the Declarations, as elected by the Named Insured, to apply to:

  **1.**  **Claims** first made against the **Insured** during the Additional Period stated in the Declarations, and reported to the Company pursuant to Paragraph **A.** Claim Reporting Provision of Section **VIII** – Claims Reporting And Notice, following immediately upon the effective date of such cancellation or nonrenewal, for any **Wrongful Act** or **Personal Injury** which happened on or after the applicable **Retroactive Date** and prior to the effective date of such cancellation or nonrenewal and which is otherwise covered by this Coverage Part; and

  **2.**  **Disciplinary Proceedings** first initiated against the **Insured** during the Additional Period stated in the Declarations, and reported to the Company pursuant to Paragraph **C.1.** Disciplinary Proceeding Legal Fee And Legal Expense Reimbursement of Section **II** – Insuring Agreements, following immediately upon the effective date of such cancellation or nonrenewal, for any **Wrongful Act** which happened on or after the applicable **Retroactive Date** and prior to the effective date of such cancellation or nonrenewal and which is otherwise covered by this Coverage Part.

  This extended period of coverage as elected by the Named Insured and described herein will be referred to in this Coverage Part as the Extended Reporting Period.

  If, however, this Coverage Part is immediately succeeded by similar claims-made insurance coverage on which the applicable **Retroactive Date** is the same as or earlier than that stated in the Declarations, the succeeding insurance will be deemed to be a renewal hereof, and in consequence, the Named Insured will have no right to purchase an Extended Reporting Period applicable to the coverage afforded under this Coverage Part.

  The quotation of a different premium, deductible, or limit of liability for renewal does not constitute a cancellation or refusal to renew for the purpose of this provision.

**C.**  As a condition precedent to the right to purchase the Extended Reporting Period, the Named Insured must have paid:

  **1.**  All deductibles when due;

  **2.**  All premiums due for the **Policy Period**; and

  **3.**  All premiums and deductibles due on any other policies issued by the Company or any of its affiliated companies in an uninterrupted series of policies of which this Policy is a renewal or replacement.

  The right to purchase the Extended Reporting Period will terminate unless a written request of such election for the Extended Reporting Period is received by the Company within 30 days after the effective date of cancellation or nonrenewal together with payment of the additional premium for the Extended Reporting Period. If such written request and premium payment for the Extended Reporting Period are not so received by the Company, there shall be no right to purchase the Extended Reporting Period at a later date.

**D.**  In the event of the purchase of the Extended Reporting Period the entire premium therefor will be fully earned at its commencement.

**E.**  The Extended Reporting Period will not in any way increase the Limits Of Liability stated in the Declarations.

**SECTION X – CHANGES IN OWNERSHIP**

**A.  New Organizations**

  If, before or during the **Policy Period,** the Named Insured acquires or creates a new **Subsidiary** or acquires an entity by merger or consolidation, to perform the same **Professional Services** as the Named Insured, coverage under this Policy automatically will apply to the new organization, provided:

1.  Such coverage will apply only with respect to any **Claim** for a **Wrongful Act** or **Personal Injury** taking place after such acquisition or creation; and

2.  There is no other similar insurance available to that organization.

Coverage will be subject to the following:

a.  Coverage is afforded only until 60 days after the Named Insured acquired or formed the organization or the end of the **Policy Period**, whichever is earlier; however, this condition shall not apply if such entity's total consolidated assets as of the date of such creation or acquisition will be no more than 25% of the total consolidated assets of the **Insured** according to the most recently filed audited financial statements;

b.  The **Retroactive Date** applicable to any **Claim** or **Disciplinary Proceeding** against such organization newly acquired or newly formed by the Named Insured for **Wrongful Acts** or **Personal Injuries** by **Insureds** will be the date on which the Named Insured newly acquired or newly formed such organization; and

c.  No person or organization is an **Insured** with respect to the conduct of any current or past partnership, joint venture, or limited liability company that is not stated as a Named Insured in the Declarations.

## B.  Acquisition Of The Insured

If, during the **Policy Period**, a transaction occurs wherein another organization gains control of the Named Insured through the ownership of more than 50% of the outstanding securities or voting rights representing the present right to vote for the election of directors or equivalent position, or the Named Insured merges into another organization or consolidates with another organization such that the Named Insured is not the surviving organization, then:

1.  The first Named Insured must give written notice of such transaction to the Company within 60 days after the effective date of such transaction and provide the Company with such information in connection therewith as the Company may deem necessary; and

2.  This Coverage Part will apply only to those **Wrongful Acts** or **Personal Injuries** which happened on or before the effective date of such transaction.

## C.  Cessation Of Subsidiaries

If before or during the **Policy Period**, an organization ceases to be a **Subsidiary**, coverage with respect to such **Subsidiary** will continue until the end of the **Policy Period** or the Extended Reporting Period, if applicable, provided such coverage will apply only with respect to any **Claim** for a **Wrongful Act** or **Personal Injury** taking place prior to the date such organization ceased to be a **Subsidiary**.

**MARKEL**

EVANSTON INSURANCE COMPANY

# COMMON POLICY CONDITIONS

All Coverage Parts included in this Policy are subject to the following conditions.

Throughout this Policy, the term Company refers to the insurance company providing this insurance.

**A. Terms And Conditions**

This Policy is comprised of these **COMMON POLICY CONDITIONS**, the Declarations, various Coverage Parts and endorsements, if applicable, and the **Application**. Although various Coverage Parts may be referenced in this Policy, a Coverage Part is included within this Policy only if that Coverage Part is stated as being purchased in the Insuring Agreement Schedule of the Declarations.

Except for these **COMMON POLICY CONDITIONS** or unless stated to the contrary in any Coverage Part or endorsement, the terms and conditions of each Coverage Part of this Policy apply only to that Coverage Part and shall not apply to any other Coverage Part of this Policy. Any defined term referenced in the **COMMON POLICY CONDITIONS** but defined in a Coverage Part shall, for purposes of coverage under that Coverage Part, have the meaning set forth in that Coverage Part. If any provision in the **COMMON POLICY CONDITIONS** is inconsistent or in conflict with the terms and conditions of any Coverage Part, the terms and conditions of such Coverage Part shall control for purposes of that Coverage Part.

**B. Policy Aggregate Limit Of Liability**

**1.** Coverage Parts Which Share An Aggregate Limit Of Liability

Notwithstanding the Limits Of Liability of any single purchased Coverage Part, the Company's maximum aggregate Limit Of Liability for all **Damages**, **Policy Payments**, and **Claim Expenses** covered under all purchased Coverage Parts which share an Aggregate Limit Of Liability, if any as shown in the Declarations, shall be the largest of the Aggregate Limit Of Liability for each Coverage Part that shares a Limit Of Liability, if any. Such shared Aggregate Limit Of Liability shall be part of, and not in addition to, the Policy Combined Aggregate Limit Of Liability stated in the Declarations. This paragraph further limits the Company's maximum liability under each such Coverage Part and does not increase the respective separate Aggregate Limit Of Liability for each Coverage Part.

**2.** Combined Aggregate Limit Of Liability

The Policy Combined Aggregate Limit Of Liability stated in the Declarations shall be the Company's maximum aggregate liability for the combined total of all **Damages**, medical expenses, **Policy Payments**, and **Claim Expenses** covered under all purchased Coverage Parts, combined.

**C. Single Limit And Deductible Or Retention Amount**

The inclusion herein of more than one **Insured** in any **Claim** or the making of **Claims** by, or reporting of a **Policy Event** or **Loss** incurred by more than one person or organization or under more than one purchased Coverage Part of this Policy, shall not operate to increase the Limits Of Liability stated in the Declarations.

It is the intent of the Company that the coverage afforded under the Coverage Parts be mutually exclusive. If however, it is determined that more than one purchased Coverage Part applies to one **Claim**, **Policy Event**, or **Loss**, then the Limit Of Liability with respect to such **Claim**, **Policy Event**, or **Loss** shall be the larger(est) Limit Of Liability available under the applicable purchased Coverage Parts and not the sum of the limits available under the applicable purchased Coverage Parts. In such event, the smaller(est) of the applicable deductibles or retention amounts for the applicable purchased Coverage Parts will apply and not the sum of such deductibles or retention amounts.

**D. Cancellation**

This Policy may be cancelled by the Named Insured on behalf of all **Insureds** by mailing to the Company written notice stating when thereafter such cancellation shall be effective. If cancelled by the Named Insured, the Company

shall retain the customary short rate proportion of the premium. Payment or tender of unearned premium shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

This Policy may be cancelled by the Company, by mailing to the Named Insured, at the address stated in the Declarations, written notice stating when, not less than 30 days thereafter, such cancellation shall be effective. However, if the Company cancels the Policy because the Named Insured has failed to pay a premium or Deductible when due, including premium, deductible(s) or co-insurance obligations(s) due on any other policy(ies) issued by the Company or any of its affiliated companies in an uninterrupted series of policies for which this Policy is a renewal or replacement, this Policy may be cancelled by the Company, by mailing a written notice of cancellation to the Named Insured stating when, not less than 10 days thereafter, such cancellation shall be effective. The mailing of notice as aforementioned shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the Policy Period. Such notice shall be conclusive on all **Insureds**. Delivery of such written notice by the Named Insured or the Company shall be equivalent to mailing. If cancelled by the Company earned premium shall be computed pro rata. Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter.

**E.   Representations**

By acceptance of this Policy, the **Insureds** agree that the information and statements contained in the **Application(s)** are:

**1.**   The basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy;

**2.**   Their representations, that shall deemed material to the acceptance of the risk or hazard assumed by the Company under this Policy; and that this Policy is issued in reliance upon the truth of such representations.

**F.   Entire Agreement**

The Declarations, **COMMON POLICY CONDITIONS**, Coverage Part(s), any written endorsements, and any **Application(s)** shall be deemed to be a single unitary contract.

**G.   Other Insurance**

This insurance shall be in excess of the applicable Deductible or Retention and any other valid and collectible insurance available to the **Insured** whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as a specific excess insurance over the Limits Of Liability provided in this Policy.

If any **Claim** under this Policy is also covered by one or more policies issued by the Company or any of its affiliated companies affording coverage to the Named Insured or to any organization or person who controls, is controlled by, or is affiliated by common control with the Named Insured unless such other insurance is written only as specific excess insurance or umbrella insurance over the Limits Of Liability provided in this Policy, then with respect to such **Claim**:

**1.**   The Limit Of Liability available under this Policy will be equal to the percentage that this Policy's available Limit Of Liability bears to the total combined Limits Of Liability available under all applicable policies; and

**2.**   The total Limit Of Liability available for such **Claim** shall not exceed the greater(est) available Limit Of Liability remaining on all such policies and its payment shall extinguish the Company's and its affiliated companies' liability on all such policies for such **Claim**.

**H.   Changes**

Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Company shall not effect a waiver or a change in any part of this Policy and shall not estop the Company from asserting any right under the terms of this Policy. The terms of this Policy shall not be waived or changed, except by written endorsement issued to form a part of this Policy, and this Policy embodies all agreements existing between the **Insureds** and the Company or any of its agents relating to this insurance.

**I.   Assignment Of Interest**

Assignment of interest under this Policy shall not bind the Company unless the Company's consent is endorsed hereon.

**J.   Subrogation**

In the event of any payment under this Policy, the Company shall be subrogated to the right of recovery of all **Insureds** to the extent of such payment. The **Insured** shall execute and deliver instruments and papers and do

whatever else is necessary to secure such rights. The **Insured** shall do nothing after the **Claim** to prejudice such rights.

The Company shall not exercise any such rights against any person or organization included in the definition of **Insured**. Notwithstanding the foregoing, however, the Company reserves the right to exercise any rights of subrogation against an **Insured** in respect of any **Claim** brought about or contributed to by an intentional, willful, dishonest, fraudulent act or omission of such **Insured** or by an act or omission of such **Insured** that constitutes a willful violation of any statute or regulation.

Any amount so recovered, whether effected by the Company or by the **Insured**, shall be allocated as follows:

1. First, for the repayment of expenses incurred toward subrogation;

2. Second, for any **Damages**, medical expenses, **Policy Payments**, and **Claim Expenses** incurred by the **Insured** which is in excess of the amount applicable limit under this Policy and which is excess of any amount paid by any insurer under any other policy;

3. Third, for any damages and claim expenses payment or any loss indemnification or payment by any excess carrier on behalf of the **Insured**;

4. Fourth, for any **Damages**, medical expenses, **Policy Payments**, or Supplementary Payment made by the Company; and

5. Last, for repayment of the **Insured's** Deductible or Retention Amount.

## K. Assistance And Cooperation Of The Insured

The **Insured** shall cooperate with the Company and upon the Company's request, the **Insured** shall:

1. Submit to examination and interview by a representative of the Company and while not in the presence of any other **Insured**, under oath if required;

2. Attend hearings, depositions, and trials;

3. Assist in effecting settlement, securing and giving evidence, and obtaining the attendance of witnesses in the conduct of suits;

4. Give written statements to the Company's representatives and meet with such representatives for the purpose of determining coverage and investigating or defending any **Claim**; and

5. Provide any information required to comply with federal or state reporting regulations;

all without cost to the Company, other than coverage provided under Loss Of Earnings And Expense Reimbursement in Section **II** – Insuring Agreements. The **Insured** shall further cooperate with the Company and do whatever is necessary to secure and effect any right of indemnity, contribution, or apportionment which the **Insured** may have.

The **Insured** shall not, except at their own cost, make any payment, admit any liability, settle any **Claims**, assume any obligation, agree to arbitration or any similar means of resolution of any dispute, waive any rights, or incur any expense without the prior written consent of the Company, such consent not to be unreasonably withheld. Any costs and expenses incurred by the **Insured** prior to the **Insured** giving written notice of a **Claim** to the Company shall be borne by the **Insured** and will not constitute satisfaction of the Deductible or Retention Amount.

## L. False Or Fraudulent Claims

If any **Insured** commits fraud in proffering any **Claim**, this insurance shall become void from the date such fraudulent **Claim** is proffered.

## M. Inspection

Any of the Company's authorized representatives will have the right and opportunity, whenever the Company so desires, to inspect at any reasonable time the **Insured's** products, goods, operations, or premises, but the Company assumes no responsibility or duty by reason of such inspection or the omission thereof. The **Insured** agrees to provide appropriate personnel to assist the Company's representatives during such inspection without cost to the Company.

## N. Action Against The Company

No action shall lie against the Company unless, as a condition precedent thereto, the **Insured** has fully complied with all of the terms and conditions of this Policy, nor until the amount of the **Insured's** obligation to pay has been fully and

finally determined either by judgment against the **Insured** after actual trial or by written agreement of the **Insured**, the claimant, and the Company.

Nothing contained in this Policy shall give any person or organization any right to join the Company as a co-defendant in any action against the **Insured** to determine the **Insured's** liability.

**O.  Bankruptcy**

Bankruptcy or insolvency of the **Insured** or of the **Insured's** estate shall not relieve the Company of any of its obligations hereunder.

**P.  Authorization**

By acceptance of this Policy, the **Insureds** agree that the first Named Insured stated in the Declarations shall act on behalf of all **Insureds** with respect to the:

**1.**  Giving and receiving of all notices to and from the Company as provided herein;

**2.**  Exercising of the Extended Reporting Period, if available;

**3.**  Cancellation of this Policy in whole or part;

**4.**  Payment of premiums and deductibles or retention amounts when due;

**5.**  Receiving of any return premiums that may become due under this Policy.

With respect to any coverage which provides for the reimbursement or indemnification of the Named Insured, the **Insureds** agree that the first Named Insured stated in the Declarations shall act on behalf of all Named Insureds with regard to the receiving of such reimbursement or indemnification as provided.

**Q.  Policy Extended Reporting Period – All Claims Made Coverages**

The Named Insured's right to exercise the Extended Reporting Period under any Coverage Part shall exist solely if the Named Insured also exercises its right to purchase the Extended Reporting Period under all Coverage Parts that provide coverage on a claims made basis.

**MARKEL**

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## FRANCHISORS

This endorsement modifies insurance provided under the following:

PROFESSIONAL LIABILITY INSURANCE COVERAGE PART

In consideration of the premium paid, it is hereby understood and agreed that:

**A.** The following is added to Definition **W. Professional Services** under Section **III** – Definitions:

**Professional Services** also means:

**1.** Providing training programs, operations manuals, and other aids necessary for the start-up of a franchise;

**2.** Providing informational bulletins and newsletters;

**3.** Giving advice and assistance in the start-up, management, and operation of a franchise, including site selection and the determination, designation, or modification of the franchise territory;

**4.** Administration of advertising and promotional programs;

**5.** Providing assistance to franchisees in marketing the services, goods, or products of the franchisee;

**6.** Development and administration of operating standards, specifications, or operating procedures for franchisees; or

**7.** The preparation, amendment, renewal, or registration of a Franchise Disclosure Document, Uniform Franchise Offering Circular, or any other offering circular described by the Federal Trade Commission.

**B.** Section **IV** – Exclusions is amended as follows:

**1.** Exclusions **F.** Employment Related Practices, **K.** Insolvency, and **AA.** Warranties Or Guarantees are replaced by the following:

With respect to all Coverages under this Coverage Part, this Coverage Part does not apply to any **Claim**, Additional Payment, or Supplementary Payment:

**F.  Employment Related Practices**

Based upon, arising out of, or in any way involving:

**1.** Any obligation of the **Insured** under any workers' compensation, unemployment compensation, or disability benefits law or under any similar law; or

**2.** Wrongful termination or other employment related practices, including, but not limited to, the employment relationship or the nature, terms, or conditions of employment or any workplace tort brought by or on behalf of any employee, former employee, prospective employee, independent contractor, or consultant of the **Insured**.

**K.  Insolvency**

Based upon or arising out of the insolvency, receivership, bankruptcy, liquidation, or financial inability to pay:

1.  Of any bank, savings and loan, banking firm, registered representative or broker/dealer of securities or commodities, insurance company, reinsurer, risk retention group or captive (or other self-insurance plan or trust by whatsoever name), real estate developer, or construction organization;

2.  Of any **Subsidiary**; or

3.  Of any **Insured**.

AA.    **Warranties Or Guarantees**

Based upon or arising out of any warranties or guarantees, whether express, implied, or otherwise, or any cost estimates, including, but not limited to, any material misrepresentation or statement made by the **Insured** pertaining to the availability of funds, specified rate of return or interest, the future value of assets or earnings, projected profits or revenues, potential sales, earnings, or profitability.

2.  The following exclusions are added:

With respect to all Coverages under this Coverage Part, this Coverage Part does not apply to any **Claim**, Additional Payment, or Supplementary Payment:

**Breach Of Contract**

Based upon or arising out of a breach of contract; however, this exclusion does not apply to obligations assumed under a written contract that are a part of the **Insured's** performance of **Professional Services** for franchisees.

**Failure To Effect Or Maintain Insurance**

Based upon or arising out of the failure to effect or maintain or to advise of the need to effect or maintain insurance, suretyship, or bond, including advice as to the type or amount.

All other terms and conditions remain unchanged.



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## MINIMUM EARNED PREMIUM

This endorsement modifies insurance provided under the following:

GENERAL LIABILITY INSURANCE FOR PROFESSIONALS COVERAGE PART
GENERAL LIABILITY INSURANCE FOR PROFESSIONALS COVERAGE PART (CLAIMS MADE)
MARKEL CYBER 360$^{SM}$ INSURANCE COVERAGE PART
MEDIA OFFENSE LIABILITY INSURANCE FOR PROFESSIONALS COVERAGE PART
PROFESSIONAL LIABILITY INSURANCE COVERAGE PART
PROFESSIONAL LIABILITY INSURANCE COVERAGE PART FOR INFORMATION TECHNOLOGY PROFESSIONALS

### SCHEDULE

| |
|---|
| Percentage:  25% |

In consideration of the premium paid, it is hereby understood and agreed that the following is added to the **COMMON POLICY CONDITIONS**:

**Minimum Earned Premium**

In the event that this Policy is cancelled by the first Named Insured, the Policy premium is subject to a minimum earned premium of the Percentage shown in the Schedule of this endorsement.

All other terms and conditions remain unchanged.



**PROFESSIONAL LIABILITY**

# EVANSTON INSURANCE COMPANY

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCLUSION – MEDICAL MALPRACTICE

This endorsement modifies insurance provided under the following:

PROFESSIONAL LIABILITY INSURANCE COVERAGE PART
PROFESSIONAL LIABILITY INSURANCE COVERAGE PART FOR INFORMATION TECHNOLOGY PROFESSIONALS

In consideration of the premium paid, it is hereby understood and agreed that the following exclusion is added to Section **IV** – Exclusions:

With respect to all Coverages under this Coverage Part, this Coverage Part does not apply to any **Claim**, Additional Payment, or Supplementary Payment:

**Medical Malpractice**

Based upon, arising out of, or in any way involving medical malpractice including, but not limited to, patient treatment, consultation with patients, or rendering medical opinions in specific treatment of any patient as the consulting medical care provider for a second opinion or primary care.

All other terms and conditions remain unchanged.

**App. 38**

**PROFESSIONAL LIABILITY**

**MARKEL**

# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCLUSION – NUCLEAR ENERGY LIABILITY (BROAD FORM)

This endorsement modifies insurance provided under the following:

GENERAL LIABILITY INSURANCE FOR PROFESSIONALS COVERAGE PART
GENERAL LIABILITY INSURANCE FOR PROFESSIONALS COVERAGE PART (CLAIMS MADE)
MARKEL CYBER 360℠ INSURANCE COVERAGE PART
MEDIA OFFENSE LIABILITY INSURANCE FOR PROFESSIONALS COVERAGE PART
PROFESSIONAL LIABILITY INSURANCE COVERAGE PART FOR INFORMATION TECHNOLOGY PROFESSIONALS
PROFESSIONAL LIABILITY INSURANCE COVERAGE PART

Please refer to each Coverage Part to determine which terms are defined. Words shown in bold font on this endorsement may or may not be defined in all Coverage Parts.

In consideration of the premium paid, it is hereby understood and agreed that the following exclusion is added to Section **IV** – Exclusions:

With respect to all Insuring Agreements, this insurance does not apply:

**Nuclear Energy**

1.  Under any Liability Coverage, to **Bodily Injury** or **Property Damage**:

    **a.**  With respect to which an **Insured** under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada, or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

    **b.**  Resulting from the **Hazardous Properties** of **Nuclear Material** and with respect to which:

        **(1)**  Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or

        **(2)**  The **Insured** is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

2.  Under any Medical Payments coverage, or any Supplementary Payments provision relating to first aid, to expenses incurred with respect to **Bodily Injury** resulting from the **Hazardous Properties** of **Nuclear Material** and arising out of the operation of a **Nuclear Facility** by any person or organization.

3.  Under any Liability Coverage, to **Bodily Injury** or **Property Damage** resulting from **Hazardous Properties** of **Nuclear Material** if:

    **a.**  The **Nuclear Material**:

        **(1)**  Is at any **Nuclear Facility** owned by, or operated by or on behalf of, an **Insured**; or

        **(2)**  Has been discharged or dispersed therefrom;

**MEEO 5309 10 20**                                                                                              **Page 1 of 2**

**App. 39**

**b.** The **Nuclear Material** is contained in **Spent Fuel** or **Waste** at any time possessed, handled, used, processed, stored, transported, or disposed of, by, or on behalf of an **Insured**; or

**c.** The **Bodily Injury** or **Property Damage** arises out of the furnishing by an **Insured** of services, materials, parts, or equipment in connection with the planning, construction, maintenance, operation, or use of any **Nuclear Facility**, but if such facility is located within the United States of America, its territories or possessions, or Canada, this exclusion **c.** applies only to **Property Damage** to such **Nuclear Facility** and any property thereat.

**4.** As used in this exclusion:

**a.** **Hazardous Properties** includes radioactive, toxic, or explosive properties.

**b.** **Nuclear Facility** means:

   **(1)** Any **Nuclear Reactor**;

   **(2)** Any equipment or device designed or used for:

   **(a)** Separating the isotopes of uranium or plutonium;

   **(b)** Processing or utilizing **Spent Fuel;** or

   **(c)** Handling, processing, or packaging **Waste**;

   **(3)** Any equipment or device used for the processing, fabricating, or alloying of **Special Nuclear Material** if at any time the total amount of such material in the custody of the **Insured** at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

   **(4)** Any structure, basin, excavation, premises, or place prepared or used for the storage or disposal of **Waste**; and

   **(5)** The site on which any of the foregoing is located, all operations conducted on such site, and all premises used for such operations.

**c.** **Nuclear Material** means **Source Material**, **Special Nuclear Material**, or **By-Product Material**.

**d.** **Nuclear Reactor** means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

**e.** **Property Damage** includes all forms of radioactive contamination of property.

**f.** **Source Material**, **Special Nuclear Material**, and **By-Product Material** have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

**g.** **Spent Fuel** means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a **Nuclear Reactor**.

**h.** **Waste** means any waste material:

   **(1)** Containing **By-Product Material** other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its **Source Material** content; and

   **(2)** Resulting from the operation by any person or organization of any **Nuclear Facility** included under paragraphs **(1)** and **(2)** of the definition of **Nuclear Facility**.

All other terms and conditions remain unchanged.



**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLV4PEO001962

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – SPECIFIED ENTITY

This endorsement modifies insurance provided under the following:

GENERAL LIABILITY INSURANCE FOR PROFESSIONALS COVERAGE PART
GENERAL LIABILITY INSURANCE FOR PROFESSIONALS COVERAGE PART (CLAIMS MADE)
MARKEL CYBER 360SM INSURANCE COVERAGE PART
MEDIA OFFENSE LIABILITY INSURANCE FOR PROFESSIONALS COVERAGE PART
PROFESSIONAL LIABILITY INSURANCE COVERAGE PART
PROFESSIONAL LIABILITY INSURANCE COVERAGE PART FOR INFORMATION TECHNOLOGY PROFESSIONALS

**SCHEDULE**

| Person Or Entity:  Junzi Holdings, LC |
|---|

Please refer to each Coverage Part to determine which terms are defined. Words shown in bold font on this endorsement may or may not be defined in all Coverage Parts.

In consideration of the premium paid, it is hereby understood and agreed that the following exclusion is added to Section **IV** – Exclusions:

With respect to all Coverages under this Coverage Part, this Coverage Part does not apply to any **Claim**, Additional Payment, Supplementary Payment, **Policy Event**, or **Policy Payment**:

**Specified Entity**

Brought by or on behalf of any Person Or Entity shown in the Schedule of this endorsement.

All other terms and conditions remain unchanged.

**App. 41**

**PROFESSIONAL LIABILITY**

**MARKEL**

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – ASBESTOS

This endorsement modifies insurance provided under the following:

PROFESSIONAL LIABILITY INSURANCE COVERAGE PART
PROFESSIONAL LIABILITY INSURANCE COVERAGE PART FOR INFORMATION TECHNOLOGY PROFESSIONALS

In consideration of the premium paid, it is hereby understood and agreed that the following is added to Section **IV** – Exclusions:

With respect to all Coverages under this Coverage Part, this Coverage Part does not apply to any **Claim**, Additional Payment, or Supplementary Payment:

**Asbestos**

Based upon, arising out of, or in any way involving asbestos, asbestos fibers, or any product or material containing asbestos in any form, under any theory of liability whatsoever.

It is further agreed that the Company shall have no duty to defend or to pay or reimburse for any fees, costs, or expenses in the investigation or defense of any **Claim** excluded herein.

All other terms and conditions remain unchanged.

**App. 42**

**PROFESSIONAL LIABILITY**

**MARKEL**

# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### EXCLUSION – VULNERABLE ADULT ABUSE

This endorsement modifies insurance provided under the following:

PROFESSIONAL LIABILITY INSURANCE COVERAGE PART
PROFESSIONAL LIABILITY INSURANCE COVERAGE PART FOR INFORMATION TECHNOLOGY PROFESSIONALS

In consideration of the premium paid, it is hereby understood and agreed that:

**A.** The following are added to Section **III** – Definitions:

**Vulnerable Adult** means any person who:

**1.** Is 60 years of age or older who has the functional, mental, or physical inability to care for himself or herself;

**2.** Is determined by a court of law to be incapacitated;

**3.** Has a developmental disability as defined by the law of the state of the person's residence; or

**4.** Is receiving services from a licensed home health, hospice, or home care agency.

**Vulnerable Adult Abuse** means any act, error, or omission which actually or allegedly results in **Bodily Injury** or **Personal Injury** to any **Vulnerable Adult**. This includes violation of any federal, state, or local statute, law, rule, ordinance, or regulation that addresses, governs, or prohibits abuse, neglect, or exploitation of **Vulnerable Adults**.

**B.** The following exclusion is added to Section **IV** – Exclusions:

With respect to all Coverages under this Coverage Part, this Coverage Part does not apply to any **Claim**, Additional Payment, or Supplementary Payment:

**Vulnerable Adult Abuse**

Based upon, arising out of, or in any way involving any actual or alleged **Vulnerable Adult Abuse** including, but not limited to, **Wrongful Acts** related to:

**a.** The employment, supervision, or retention of persons who actually or allegedly engaged in **Vulnerable Adult Abuse**;

**b.** The reporting to authorities of **Vulnerable Adult Abuse**; or

**c.** The failure to do any of the foregoing.

All other terms and conditions remain unchanged.

**PROFESSIONAL LIABILITY**

**MARKEL**

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – VIOLATION OF STATUTES RELATED TO PERSONAL DATA

This endorsement modifies insurance provided under the following:

PROFESSIONAL LIABILITY INSURANCE COVERAGE PART
PROFESSIONAL LIABILITY INSURANCE COVERAGE PART FOR INFORMATION TECHNOLOGY PROFESSIONALS

In consideration of the premium paid, it is understood and agreed that:

**A.** The following definition is added to Section **III** – Definitions:

**Personal Data** means information that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked to a particular person or household, including, but not limited to:

**1.** Identifiers such as a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, password, account name, social security number, driver's license or state identification card number, passport number, telephone number, insurance policy number, employment, employment history, bank account number, credit card number, debit card number, or any other financial information, medical information, or health insurance information, or other similar identifiers, characteristics, or descriptors;

**2.** Commercial information, including records of personal property, products, or services purchased, obtained, or considered, transactions occurring over a peer-to-peer electronic cash system, or other purchasing or consuming histories or tendencies;

**3.** Biometric data or information (such as a fingerprint, voice print, retina or iris image, or other unique physical representation or digital representation of biometric data);

**4.** Internet or other electronic network activity information, including, but not limited to, browsing history, search history, and information regarding a person's or household's interaction with an internet website, application, or advertisement;

**5.** Geolocation data;

**6.** Audio, electronic, visual, thermal, olfactory, or similar information;

**7.** Professional or employment-related information that is not publicly available;

**8.** Education information, defined as information that is not publicly available personally identifiable information as defined in the Family Educational Rights and Privacy Act (FERPA) (20 U.S.C. section 1232g; 34 C.F.R. Part 99) including any amendments thereto;

**9.** Identifiers set forth under any state or federal consumer protection or privacy statute or law including, but not limited to, the identifiers shown in Paragraphs **1.** through **8.** above; or

**10**. Inferences drawn from any of the identifiers shown in Paragraphs **1.** through **9.** above to create a profile about a person or household reflecting such person's or household's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, or aptitudes.

**B.** The following exclusion is added to Section **IV** – Exclusions:

With respect to all Coverages under this Coverage Part, this Coverage Part does not apply to any **Claim**, Additional Payment, or Supplementary Payment:

**App. 44**

**Violation Of Statutes Related To Personal Data**

Based upon, arising out of, or in any way involving, directly or indirectly, any action or omission that violates or is alleged to violate any federal, state, or local statute, law, rule, ordinance, or regulation, that addresses, prohibits, regulates, or limits the printing, interception, dissemination, disposal, collecting, recording, sending, transmitting, communicating, distribution, sharing, sale, storage, retaining, receiving, or protection of **Personal Data**, including, but not limited to:

1. The Illinois Biometric Information Privacy Act (BIPA);

2. The California Consumer Privacy Act (CCPA);

3. The California Invasion Of Privacy Act (CIPA);

4. The New York Stop Hacks and Improve Electronic Data Security Act (SHIELD Act);

5. The European Union General Data Protection Regulation (GDPR); and

6. Any similar or related federal, state, or local statute, law, rule, ordinance, or regulation;

including any amendments thereto.

However, this exclusion shall not apply to a TCPA Violation or FCRA Violation if covered under Section **II.B.1.** and **2.**

All other terms and conditions remain unchanged.

**MARKEL**

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMEND POLLUTION EXCLUSION

This endorsement modifies insurance provided under the following:

PROFESSIONAL LIABILITY INSURANCE COVERAGE PART
PROFESSIONAL LIABILITY INSURANCE COVERAGE PART FOR INFORMATION TECHNOLOGY PROFESSIONALS

The **Pollution** exclusion under Section **IV** – Exclusions is replaced by the following:

With respect to all Coverages under this Coverage Part, this Coverage Part does not apply to any **Claim**, Additional Payment, or Supplementary Payment:

**Pollution**

Based upon or arising out of:

1. Any actual, alleged, or threatened discharge, disposal, migration, dispersal, release, presence, or escape of **Pollutants**;

2. Any directive, order, or request to test for, monitor, remediate, clean up, remove, contain, treat, detoxify, or neutralize **Pollutants**; or

3. The failure to undertake any action described in Paragraph **2.** above, or to pay for or contribute to the costs of undertaking such actions.

All other terms and conditions remain unchanged.

**MARKEL**

## EVANSTON INSURANCE COMPANY

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# TEXAS AMENDATORY

This endorsement modifies insurance provided under the following:

GENERAL LIABILITY INSURANCE FOR PROFESSIONALS COVERAGE PART
GENERAL LIABILITY INSURANCE FOR PROFESSIONALS COVERAGE PART (CLAIMS MADE)
MARKEL CYBER 360$^{SM}$ INSURANCE COVERAGE PART
MEDIA OFFENSE INSURANCE COVERAGE PART FOR PROFESSIONALS
PROFESSIONAL LIABILITY INSURANCE COVERAGE PART
PROFESSIONAL LIABILITY INSURANCE COVERAGE PART FOR INFORMATION TECHNOLOGY PROFESSIONALS

In consideration of the premium paid, is it hereby understood and agreed that, if a **Claim** covered under this Policy or applicable coverage part does not require the **Insured** to consent to settlement of such **Claim**, the Company will notify the Named Insured in writing of:

1.  An initial offer to settle a **Claim** against an **Insured** not later than the 10th day after the date an initial offer to settle a **Claim** is made; and

2.  A settlement of a **Claim** against an **Insured** not later than the 30th day after the date a **Claim** is settled.

All other terms and conditions remain unchanged.

**MEEO 5418-TX 10 20**



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMENDED EXCLUSIONS – MEDIA-RELATED OFFENSES AND PATENTS, COPYRIGHTS, OR TRADE SECRETS

This endorsement modifies insurance provided under the following:

PROFESSIONAL LIABILITY INSURANCE COVERAGE PART

**A.** Definitions **G. Content** and **O. Media Offense** under Section **III** – Definitions are deleted in their entirety.

**B.** Exclusions **N.** Media Offense and **R.** Patents Or Trade Secrets under Section **IV** – Exclusions are replaced by the following:

With respect to all Coverages under this Coverage Part, this Coverage Part does not apply to any **Claim**, Additional Payment, or Supplementary Payment:

**N. Media-related Offenses**

Based upon or arising out of:

**1.** Improper deep-linking, framing, web harvesting, web scraping, or data extraction; or

**2.** Plagiarism, piracy, or misappropriation of ideas under implied contract.

**R. Patents, Copyrights, Or Trade Secrets**

Based upon or arising out of:

**1.** Infringement or inducement of infringement of copyright, patent, trademark, service mark, trade name, or trade secret or misappropriation of trade secrets or confidential or proprietary information;

**2.** Unfair competition based upon infringement of copyright, patent, trademark, service mark, trade name, or trade secret;

**3.** The value of trade secrets or confidential processing methods; or

**4.** Any dispute related to ownership of any intellectual property.

All other terms and conditions remain unchanged.



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SERVICE OF SUIT

Except with respect to any policy issued in any state in which the Insurer is licensed as an admitted insurer to transact business, it is agreed that in the event of the failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the Named Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court. Nothing in this clause constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Secretary, Legal Department, Markel Service, Incorporated, 10275 West Higgins Road, Suite 750, Rosemont, Illinois 60018, and that in any suit instituted against the Company upon this policy, the Company will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner or Director of Insurance or other official specified for that purpose in the statute, or his/her successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured or any beneficiary hereunder arising out of this policy, and hereby designates the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – UNMANNED AIRCRAFT

This endorsement modifies insurance provided under the following:
GENERAL LIABILITY INSURANCE FOR PROFESSIONALS COVERAGE PART
GENERAL LIABILITY INSURANCE FOR PROFESSIONALS COVERAGE PART (CLAIMS MADE)
PROFESSIONAL LIABILITY INSURANCE COVERAGE PART
PROFESSIONAL LIABILITY INSURANCE COVERAGE PART FOR INFORMATION TECHNOLOGY PROFESSIONALS

In consideration of the premium paid, it is understood and agreed that the policy is amended as follows:

**A.** The PROFESSIONAL LIABILITY INSURANCE COVERAGE PART and PROFESSIONAL LIABILITY INSURANCE COVERAGE PART FOR INFORMATION TECHNOLOGY PROFESSIONALS are amended as follows:

    **1.** The following is added to Section **III** – Definitions :

        **Unmanned Aircraft** means an aircraft that is not designed, manufactured, or modified after manufacture, to be controlled directly by a person from within or on the aircraft.

    **2.** The following is added to Paragraph **C.** of Section **IV** – Exclusions:

        With respect to all Coverages under this Coverage Part, this Coverage Part does not apply to any **Claim**, Additional Payment or Supplementary Payment:

        **C.** Based upon, arising out of or in any way involving:

            The ownership, maintenance, use or entrustment to others of any aircraft that is an **Unmanned Aircraft**. Solely for purposes of this exclusion, "use" includes operation of or exercise of any control over an **Unmanned Aircraft**; and the **Insured's** authorization, direction or acquiescence in the operation or control of **Unmanned Aircraft** by any person or entity; and loading or unloading of any such **Unmanned Aircraft**. This exclusion applies even if any such **Claim** alleges negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by the **Insured**, involving the ownership, maintenance, use or entrustment to others of any aircraft that is an **Unmanned Aircraft**.

**B.** The GENERAL LIABILITY INSURANCE FOR PROFESSIONALS COVERAGE PART and the GENERAL LIABILITY INSURANCE FOR PROFESSIONALS COVERAGE PART (CLAIMS MADE) are amended as follows:

    **1.** Paragraph **B.** of Section **III** – Definitions  is replaced by the following:

        **B.** **Aircraft Products** means any aircraft whether or not heavier than air, including manned and **Unmanned Aircraft**, spacecraft and missiles, and any ground support, guidance, control or communications equipment used in connection therewith, and also includes parts, supplies, or equipment installed in or on or used in connection with aircraft, including tools, training aids, instructions, manuals, blueprints and other data, engineering and other advice, services and labor used in the operation, maintenance or manufacture of **Aircraft Products**.

    **2.** The following is added to Section **III** – Definitions:

        **Unmanned Aircraft** means an aircraft that is not designed, manufactured, or modified after manufacture, to be controlled directly by a person from within or on the aircraft.

    **3.** The following is added to Paragraph **A.2.** of Section **IV** – Exclusions:

        **A.** With respect to all Coverages, this Coverage Part does not apply to any **Claim** or Supplementary Payment:

            **2.** Based upon, arising out of or in any way involving:

**MEIL 1330 08 17**      Includes copyrighted material of Insurance Services Office, Inc. with its permission.      **Page 1 of 2**

**App. 50**

**Bodily Injury**, **Property Damage** or **Personal And Advertising Injury** arising out of the ownership, maintenance, use or entrustment to others of any aircraft that is an **Unmanned Aircraft**. Solely for purposes of this exclusion, "use" includes operation of or exercise of any control over an **Unmanned Aircraft**; and the **Insured's** authorization, direction or acquiescence in the operation or control of **Unmanned Aircraft** by any person or entity; and loading or unloading of any such **Unmanned Aircraft**. This exclusion applies even if any such **Claim** alleges negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by the **Insured**, if the **Occurrence** which caused the **Bodily Injury** or **Property Damage** or the offense which caused the **Personal And Advertising Injury** involved the ownership, maintenance, use or entrustment to others of any aircraft that is an Unmanned Aircraft.

4. Paragraph **B.1.f.** of Section **IV** – Exclusions is replaced by the following:

B. With respect to Paragraph **A.** Bodily Injury And Property Damage Liability of Section **II** – Insuring Agreements, this Coverage Part does not apply to any **Claim**:

1. Based upon or arising out of:

f. **Bodily Injury** or **Property Damage** arising out of ownership, maintenance, operation, use or entrustment to others or loading or unloading of:

(1) Any **Automobile**, aircraft other than an **Unmanned Aircraft** or watercraft owned or operated by or rented or loaned to any **Insured**; or

(2) Any other **Automobile**, aircraft other than an **Unmanned Aircraft** or watercraft operated by any person in the course of employment by the Named Insured;

This exclusion applies even if any such **Claim** alleges negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by the **Insured**, if the **Occurrence** which caused the **Bodily Injury** or **Property Damage** involved the ownership, maintenance, use or entrustment to others of any aircraft other than **Unmanned Aircraft**, **Automobile** or watercraft that is owned or operated by or rented or loaned to any **Insured**;

however, this exclusion shall not apply to:

(1) The parking of an **Automobile** on premises owned by, rented to or controlled by the Named Insured or on ways next to such premises, if such **Automobile** is not owned by or rented or loaned to any **Insured**;

(2) A watercraft while ashore on premises owned by, rented to or controlled by the Named Insured; or

(3) A watercraft that is less than 26 feet in length, that is not owned by the Named Insured and that is not being used to carry persons or property for a charge;

All other terms and conditions remain unchanged.

**MEIL 1330 08 17**        Includes copyrighted material of Insurance Services Office, Inc. with its permission.        **Page 2 of 2**

**App. 51**



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## TRADE OR ECONOMIC SANCTIONS

The following is added to this policy:

**Trade Or Economic Sanctions**

This insurance does not provide any coverage, and we (the Company) shall not make payment of any claim or provide any benefit hereunder, to the extent that the provision of such coverage, payment of such claim or provision of such benefit would expose us (the Company) to a violation of any applicable trade or economic sanctions, laws or regulations, including but not limited to, those administered and enforced by the United States Treasury Department's Office of Foreign Assets Control (OFAC).

All other terms and conditions remain unchanged.

**A STOCK COMPANY**



# EVANSTON INSURANCE COMPANY

10275 West Higgins Road, Suite 750
Rosemont, IL 60018

**INSURANCE POLICY**

**Coverage afforded by this policy is provided by the Company (Insurer) and named in the Declarations.**

In **Witness Whereof**, the company (insurer) has caused this policy to be executed and attested and countersigned by a duly authorized representative of the company (insurer) identified in the Declarations.

| | |
|---|---|
| _(signature)_ | _(signature)_ |
| **Secretary** | **President** |

**App. 53**

**MARKEL**

# EVANSTON INSURANCE COMPANY

## MARKEL'S DESIGNED PROTECTION®
## RISK MANAGEMENT RESOURCES FOR PROFESSIONALS

Welcome to Markel's Designed Protection® leading edge Risk Management Resources.

The following risk management resources are available exclusively to our policyholders at our website www.markelcorp.com/riskmanagement at no additional cost.

**HOW TO QUICKLY ACCESS RISK MANAGEMENT RESOURCES:**

Step 1.    Go onto our website, www.markelcorp.com/riskmanagement.

Step 2.    Select the Designed Protection services that apply to your policy, to get to the Login screen.

Step 3.    Review the disclaimer, enter your current policy number and click on the button below to access. Your policy number is MKLV4PEO001962

**Available Risk Management Resources include:**

**Designed Protection® Risk Management Telephone Hotline for Professional Service Providers**

This confidential telephone hotline is staffed by a panel of risk management experts that are available to answer general risk management questions.

**Designed Protection® for Professional Services Firms – Leading Edge Strategies for Effective Risk Management**

This Guide provides information about principles of effective risk management including client satisfaction, billing practices and prompt and effective action in the event of an error or omission.

**Top 10 Tips for Liability Loss Avoidance for Professional Services Providers**

A concise, bullet point summary of 10 liability risk avoidance strategies.

Please check our website regularly as additional resources are added throughout the year.

**INTERLINE**

**MARKEL**

# EVANSTON INSURANCE COMPANY

## PRIVACY NOTICE

U. S. Consumer Privacy Notice                                                                 Rev. 1/1/2020

| FACTS | WHAT DOES MARKEL GROUP OF COMPANIES REFERENCED BELOW (INDIVIDUALLY OR COLLECTIVELY REFERRED TO AS "WE", "US", OR "OUR") DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| Why? | In the course of Our business relationship with you, We collect information about you that is necessary to provide you with Our products and services. We treat this information as confidential and recognize the importance of protecting it. Federal and state law gives you the right to limit some but not all sharing of your personal information. Federal and state law also requires Us to tell you how We collect, share, and protect your personal information. Please read this notice carefully to understand what We do. |
| What? | The types of personal information We collect and share depend on the product or service you have with Us. This information can include:<br><br>• your name, mailing and email address(es), telephone number, date of birth, gender, marital or family status, identification numbers issued by government bodies or agencies (i.e.: Social Security number or FEIN, driver's license or other license number), employment, education, occupation, or assets and income from applications and other forms from you, your employer and others;<br><br>• your policy coverage, claims, premiums, and payment history from your dealings with Us, Our Affiliates, or others;<br><br>• your financial history from other insurance companies, financial organizations, or consumer reporting agencies, including but not limited to payment card numbers, bank account or other financial account numbers and account details, credit history and credit scores, assets and income and other financial information, or your medical history and records.<br><br>Personal information does not include:<br><br>• publicly-available information from government records;<br><br>• de-identified or aggregated consumer information.<br><br>When you are no longer Our customer, We continue to share your information as described in this Notice as required by law. |
| How? | All insurance companies need to share customers' personal information to run their everyday business. In the section below, We list the reasons financial companies can share their customers' personal information; the reasons We choose to share; and whether you can limit this sharing. We restrict access to your personal information to those individuals, such as Our employees and agents, who provide you with insurance products and services. We may disclose your personal information to Our Affiliates and Nonaffiliates (1) to process your transaction with Us, for instance, to determine eligibility for coverage, to process claims, or to prevent fraud, or (2) with your written authorization, or (3) otherwise as permitted by law. We do not disclose any of your personal information, as Our customer or former customer, except as described in this Notice. |

**App. 55**

| Reasons We can share your personal information | Do We share? | Can you limit this sharing? |
|---|---|---|
| **For Our everyday business purposes and as required by law –** such as to process your transactions, maintain your account(s), respond to court orders and legal/regulatory investigations, to prevent fraud, or report to credit bureaus | Yes | No |
| **For Our marketing purposes –** to offer Our products and services to you | Yes | No |
| **For Joint Marketing with other financial companies** | Yes | No |
| **For Our Affiliates' everyday business purposes –** information about your transactions and experiences | Yes | No |
| **For Our Affiliates' everyday business purposes –** information about your creditworthiness | No | We don't share |
| **For Our Affiliates to market you** | No | We don't share |
| **For Nonaffiliates to market you** | No | We don't share |
| **Questions?** Call (888) 560-4671 or email privacy@markel.com | | |

| Who We are | |
|---|---|
| **Who is providing this Notice?** | A list of Our companies is located at the end of this Notice. |

| What We do | |
|---|---|
| **How do We protect your personal information?** | We maintain reasonable physical, electronic, and procedural safeguards to protect your personal information and to comply with applicable regulatory standards. For more information, visit www.markel.com/privacy-policy. |
| **How do We collect your personal information?** | We collect your personal information, for example, when you  complete an application or other form for insurance  perform transactions with Us, Our Affiliates, or others  file an insurance claim or provide account information  use your credit or debit card  We also collect your personal information from others, such as consumer reporting agencies that provide Us with information such as credit information, driving records, and claim histories. |
| **Why can't you limit all sharing of your personal information?** | Federal law gives you the right to limit only  sharing for Affiliates' everyday business purposes – information about your creditworthiness  Affiliates from using your information to market to you  sharing for Nonaffiliates to market to you  State laws and individual companies may give you additional rights to limit sharing. See the Other Important Information section of this Notice for more on your rights under state law. |

| Definitions | |
|---|---|
| **Affiliates** | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br><br>• Our Affiliates include member companies of Markel Group. |
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br><br>• Nonaffiliates that We can share with can include financial services companies such as insurance agencies or brokers, claims adjusters, reinsurers, and auditors, state insurance officials, law enforcement, and others as permitted by law. |
| **Joint Marketing** | A formal agreement between Nonaffiliated companies that together market financial products or services to you.<br><br>• Our Joint Marketing providers can include entities providing a service or product that could allow Us to provide a broader selection of insurance products to you. |

| Other Important Information |
|---|
| **For Residents of AZ, CT, GA, IL, ME, MA, MN, MT, NV, NJ, NC, OH, OR, and VA:** Under state law, under certain circumstances you have the right to access and request correction, amendment or deletion of personal information that We have collected from or about you. To do so, contact your agent, visit www.markel.com/privacy-policy, call (888) 560-4671, or write to Markel Corporation Privacy Office, 4521 Highwoods Parkway, Glen Allen, VA 23060.<br><br>We may charge a reasonable fee to cover the costs of providing this information. We will let you know what actions We take. If you do not agree with Our actions, you may send Us a statement. |
| **For Residents of CA:** You have the right to review, make corrections, or delete your recorded personal information contained in Our files. To do so, contact your agent, visit www.markel.com/privacy-policy, call (888) 560-4671, or write to Markel Corporation Privacy Office, 4521 Highwoods Parkway, Glen Allen, VA 23060. We do not and will not sell your personal information.<br><br>For the categories of personal information We have collected from consumers within the last 12 months, please visit: www.markel.com/privacy-policy. |
| **For Residents of MA and ME:** You may ask, in writing, for specific reason, for an adverse underwriting decision. |
| **Markel Group of Companies Providing This Notice:** City National Insurance Company, Essentia Insurance Company, Evanston Insurance Company, FirstComp Insurance Company, Independent Specialty Insurance Company, National Specialty Insurance Company, Markel Bermuda Limited, Markel American Insurance Company, Markel Global Reinsurance Company, Markel Insurance Company, Markel International Insurance Company Limited, Markel Service, Incorporated, Markel West, Inc. (d/b/a in CA as Markel West Insurance Services), Pinnacle National Insurance Company, State National Insurance Company, Inc., Superior Specialty Insurance Company, SureTec Agency Services, Inc. (d/b/a in CA as SureTec Agency Insurance Services), SureTec Indemnity Company, SureTec Insurance Company, United Specialty Insurance Company, Inc. |



**MARKEL**

# EVANSTON INSURANCE COMPANY

## TEXAS IMPORTANT NOTICE

### Have a complaint or need help?

If you have a problem with a claim or your premium, call your insurance company or HMO first. If you can't work out the issue, the Texas Department of Insurance may be able to help.

Even if you file a complaint with the Texas Department of Insurance, you should also file a complaint or appeal through your insurance company or HMO. If you don't, you may lose your right to appeal.

**EVANSTON INSURANCE COMPANY**
To get information or file a complaint with your insurance company or HMO:
    **Call: Markel Legal Department**
    **Toll-free: 1-800-507-7626**
    Online: www.markel.com
    Email: legalregulatory@markel.com
    Mail: 10275 West Higgins Rd, Suite 750, Rosemont, IL 60018

**The Texas Department of Insurance**
To get help with an insurance question or file a complaint with the state:
    Call with a question: 1-800-252-3439
    File a complaint: www.tdi.texas.gov
    Email: ConsumerProtection@tdi.texas.gov
    Mail: MC 111-1A, P.O. Box 149091, Austin, TX 78714-9091

### ¿Tiene una queja o necesita ayuda?

Si tiene un problema con una reclamación o con su prima de seguro, llame primero a su compañía de seguros o HMO. Si no puede resolver el problema, es posible que el Departamento de Seguros de Texas (Texas Department of Insurance, por su nombre en inglés) pueda ayudar.

Aun si usted presenta una queja ante el Departamento de Seguros de Texas, también debe presentar una queja a través del proceso de quejas o de apelaciones de su compañía de seguros o HMO. Si no lo hace, podría perder su derecho para apelar.

**EVANSTON INSURANCE COMPANY**
Para obtener información o para presentar una queja ante su compañía de seguros o HMO:
    **Llame a: Markel Legal Department**
    **Teléfono gratuito: 1-800-507-7626**
    Online: www.markel.com
    Correo electrónico: legalregulatory@markel.com
    Dirección postal: 10275 West Higgins Rd, Suite 750, Rosemont, IL 60018

**El Departamento de Seguros de Texas**
Para obtener ayuda con una pregunta relacionada con los seguros o para presentar una queja ante el estado:
    Llame con sus preguntas al: 1-800-252-3439
    Presente una queja en: www.tdi.texas.gov
    Correo electrónico: ConsumerProtection@tdi.texas.gov
    Dirección postal: MC 111-1A, P.O. Box 149091, Austin, TX 78714-9091

**MARKEL**

# EVANSTON INSURANCE COMPANY

## IMPORTANT POLICYHOLDER NOTICE

## TEXAS SURPLUS LINES NOTICE

This insurance contract is with an insurer not licensed to transact insurance in this state and is issued and delivered as surplus line coverage under the Texas insurance statutes. The Texas Department of Insurance does not audit the finances or review the solvency of the surplus lines insurer providing this coverage, and the insurer is not a member of the property and casualty insurance guaranty association created under Chapter 462, Insurance Code. Chapter 225, Insurance Code, requires payment of a 4.85% (percent) tax on gross premium.



INTERLINE

# EVANSTON INSURANCE COMPANY

## U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – https://www.treasury.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

**MPIL 1083 04 15**    Includes copyrighted material of Insurance Services Office, Inc. with its permission.    **Page 1 of 1**

**App. 60**



# EVANSTON INSURANCE COMPANY

## NOTICE TO POLICYHOLDERS
## CLAIM REPORTING

If you purchased DataBreach coverage as a part of this policy with Markel and are experiencing a data breach or believe you have experienced a data breach, please immediately report a new claim under this policy to:

**MARKEL CYBER SUPPORT HOTLINE**

A live operator will connect you with breach response counsel. Markel claims and breach response counsel can deploy services and resources to rapidly address a policy event.

**Phone: 844-462-7535 (844) 4MARKEL**

For all other claim reporting that does not require immediate assistance, please report a new claim under this policy to:

**newclaims@markelcorp.com**

For general claims inquiries after a claim has been reported, please email:

**markelclaims@markelcorp.com**

In order for us to expedite the handling of your claim and quickly refer it to the appropriate party, please have the following information available:
- Claim number (or report as new)
- Your name, contact information and position with the Named Insured
- Date of loss
- Policy number and insured name
- Details of loss

Our address and additional contact information are as follows:
Markel Claims
P.O. Box 2009
Glen Allen, VA 23058-2009
Phone:  800-362-7535 (800) 3MARKEL
Fax:  855-662-7535 (855) 6MARKEL

Markel understands the importance of having knowledgeable claims professionals prepared to answer your questions with personal attention and expertise. With claims professionals located across four times zones, you are sure to find the claims assistance you need -- when you need it.

**PLEASE REFER TO THE POLICY FOR ANY NOTICE AND REPORTING PROVISIONS
AND DUTIES IN THE EVENT OF LOSS OR DAMAGE TO COVERED PROPERTY.**

# EXHIBIT 1-B

1  WENDY C. YORK, SBN 166864
   DANIEL JAY, SBN 215860
2  VIRGINIA MARTUCCI, SBN 316296
   YORK LAW CORPORATION
3  1111 Exposition Blvd., Bldg. 500
   Sacramento, California 95815
4  Phone: (916) 643-2200
   Fax: (916) 643-4680
5
   Attorneys for Plaintiffs JULIE EGELAND (Decedent) and
6  WILLIAM CLAIR, Individually and as Successor in Interest

7

8              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                  IN AND FOR THE COUNTY OF SACRAMENTO

10

| 11  JULIE EGELAND (Decedent), and WILLIAM CLAIR, Individually and as Successor in Interest to JULIE EGELAND, | CASE NO.: |
|---|---|
| 12 | **COMPLAINT FOR NEGLIGENCE;** |
| 13                    Plaintiffs, | **FRAUD/MISREPRESENTATION;** |
| | **UNFAIR BUSINESS PRACTICES AND** |
| 14        vs | ***PROFESSIONS CODE § 17200;*** |
| 15  A.S.K. CONSULTING & DESIGN LLC dba | **FINANCIAL ELDER ABUSE;** |
| | HOMEWELL CARE SERVICES; HOMEWELL | **VIOLATION OF THE CLRA;** |
| 16  CARE SERVICES INC.; HOMEWELL SENIOR | **WRONGFUL DEATH** |
| | CARE, INC.; HOMEWELL FRANCHISING | |
| 17  INC.; SAMANTHA MCCOY; ANTHONY NOLE; *and DOES 1 through 50, inclusive,* | |
| 18                    Defendants. | |

19

20          Plaintiffs JULIE EGELAND (Decedent) and WILLIAM CLAIR, individually and as

21  successor in interest to Decedent JULIE EGELAND, hereby complain of Defendants, and each of

22  them, and for causes of action as follows:

23                        **PRELIMINARY ALLEGATIONS**

24      1.      This is a case involving negligence, wrongful death, and related violations by a

25  home care organization brought on behalf of Decedent JULIE EGELAND and her successor in

26  interest WILLIAM CLAIR against the owners, operators, and managers of a Home Care

27  Organization "HCO" charged with the care of Decedent JULIE EGELAND. JULIE EGELAND

28  sustained serious injuries, including her death, that resulted from the Defendants' negligence and

1  failures to render basic custodial care and assistance with activities of daily living, failures to

2  provide a safe environment, and failures to act reasonably in caring for her despite representations

3  that they would do so and despite an agreement that they would provide those services and despite

4  their duty to provide those services.  In violation of the duties owed to JULIE EGELAND,

5  Defendants failed to use proper precautions to prevent injury to JULIE EGELAND; failed to

6  ensure there was a caregiver present to care for her; and failed to seek medical attention for Ms.

7  EGELAND when she was suffering from a fractured back leaving her in excruciating pain for

8  several days.

9       2.     Defendants promised Ms. EGELAND and her family, both when the parties

10  contracted for Ms. EGELAND's care and throughout her time as a client with the organization,

11  that they would be providing a very high quality of care and that they were taking whatever steps

12  were necessary to ensure Ms. EGELAND's safety and comfort.  These claims were false and it led

13  to Ms. EGELAND being abandoned when one of Defendants' caregivers failed to show up for

14  their shift leaving Ms. EGELAND abandoned without the care and services she paid for which

15  forced her to attend to her own needs leading to her falling and breaking her back.  Thereafter,

16  despite knowledge of the serious injuries Ms. EGELAND sustained and the fact that she was

17  suffering in pain, Defendants breached their obligations to Ms. EGELAND when they failed to

18  alert her family about her injuries or otherwise seek medical treatment for her.  Ms. EGELAND

19  died as a result of her injuries.

20                                    **THE PARTIES**

21       3.     Plaintiff WILLIAM CLAIR is the brother and successor in interest of Decedent

22  JULIE EGELAND and succeeds to these causes of action.  Plaintiff brings this complaint, in part,

23  in his capacity as a successor in interest and, in part, on his own behalf as an individual.  Plaintiff

24  has filed the necessary declarations pursuant to Code of Civil Procedure § 377.32.

25       4.     Up until her fall that resulted in a fractured back and her eventual death, Ms.

26  EGELAND lived on her own but needed the assistance of in-home care.  Ms. EGELAND had a

27  fulfilling, normal life in which she was capable of making decisions for herself and spending time

28

1  with loved ones. Ms. EGELAND was born on September 25, 1940, and during all times pertinent

2  to this Complaint she was 82 years old and living in Roseville, California.

3       5.     Defendant A.S.K. CONSULTING & DESIGN LLC dba HOMEWELL CARE

4  SERVICES is a Nevada Limited Liability Company and the licensee of the Home Care

5  Organization "HCO" at issue in this case. A.S.K. CONSULTING & DESIGN LLC dba

6  HOMEWELL CARE SERVICES runs its operations out of an office located in Roseville,

7  California but it also provides home care services and operates in the cities of Folsom, Rancho

8  Cordova, Lincoln, El Dorado Hills, and surrounding areas. Records from the California Secretary

9  of State show that A.S.K. Consulting & Design LLC's California office is located at 1728

10  Parkway Drive North in Folsom, California. Defendant's HOMEWELL CARE SERVICES is a

11  franchise from which JULIE EGELAND hired caregivers who abandoned her and left her alone to

12  fall and suffer injury.

13       6.     Defendant SAMANTHA MCCOY is an individual residing in California at all

14  relevant times. She is one of the owners and managers of the HOMEWELL CARE SERVICES

15  "HCO" at issue in this case that provided, or failed to provide, services to JULIE EGELAND.

16  Records from the California Department of Social Services indicate that she holds herself out to

17  the public and state licensing agencies as the Manager and President of the HOMEWELL CARE

18  SERVICES "HCO" at issue in this case that provided services to JULIE EGELAND. As such,

19  Defendant MCCOY was responsible for the day-to-day decision-making at HOMEWELL CARE

20  SERVICES and is legally responsible for its operations and for the damages suffered by JULIE

21  EGELAND.

22       7.     Defendant ANTHONY R. NOLE (also known as Tony Nole) is an individual

23  residing in California and the member/manager of A.S.K. CONSULTING & DESIGN LLC dba

24  HOMEWELL CARE SERVICES and one of the owners, operators, and managers of the

25  HOMEWELL CARE SERVICES "HCO" at issue in this case. He resides in the city of Folsom

26  and in the County of Sacramento, California. As such, Defendant NOLE was responsible for the

27  day-to-day decision-making at HOMEWELL CARE SERVICES and is legally responsible for its

28  operations and for the damages suffered by JULIE EGELAND.

8.    Defendants HOMEWELL CARE SERVICES INC., HOMEWELL SENIOR CARE, INC., and HOMEWELL FRANCHISING, INC., are Texas corporations and franchisors of the HOMEWELL CARE SERVICES "HCO" operated by Defendants A.S.K. CONSULTING & DESIGN LLC, MCCOY, and NOLE.  Defendants HOMEWELL CARE SERVICES INC., HOMEWELL SENIOR CARE, INC., and HOMEWELL FRANCHISING, INC. are responsible for the traditional and internet website advertising for HOMEWELL CARE SERVICES franchisees including for A.S.K. CONSULTING & DESIGN LLC dba HOMEWELL CARE SERVICES and, upon information and belief, publish interactive websites (i.e., not merely passive ones) that reach California consumers and senior citizens and that allow consumers to begin selecting services, view videos, and select locations for services.  Defendants HOMEWELL CARE SERVICES INC., HOMEWELL SENIOR CARE, INC., and HOMEWELL FRANCHISING, INC. direct said advertising to California residents including JULIE EGELAND.  As discussed herein, Defendants' websites make misrepresentations about the characteristics, standards, quality, and grades of the services HOMEWELL CARE SERVICES franchisees provide, including the services Defendant A.S.K. CONSULTING & DESIGN LLC dba HOMEWELL CARE SERVICES, claimed it would provide to JULIE EGELAND such as misrepresenting that HOMEWELL CARE SERVICES provides home health (as opposed to home care) services and that home care aids are available and present 24-hours a day.

9.    Thus, Defendants HOMEWELL CARE SERVICES INC., HOMEWELL SENIOR CARE, INC., and HOMEWELL FRANCHISING, INC. have sufficient minimum contacts with California and intentionally and purposefully have availed themselves to California jurisdiction so as to render the exercise of jurisdiction by this Court proper.  Further, Defendants have actively marketed and directed their services towards California which is where Plaintiff viewed said marketing materials (e.g., websites) and purchased the services Defendants were advertising.  Further, Defendants websites do not clearly state that they are advertising on behalf of franchisees which reasonably leads California consumers and senior citizens to believe that HOMEWELL CARE SERVICES INC., HOMEWELL SENIOR CARE, INC., and HOMEWELL

COMPLAINT   4

1  FRANCHISING, INC. are the agents, alter-egos, and/or joint venturers of Defendants A.S.K.

2  CONSULTING & DESIGN LLC, MCCOY, and NOLE and vice versa.

3    10.    Together the Defendants and DOES 1 through 50 operate as a single enterprise in

4  the ownership, management, and operation of an HCO known as HOMEWELL CARE

5  SERVICES and were in the business of providing continuous home care as an HCO as defined in

6  section 1796.12 of the California Health and Safety Code, and subject to the requirements of State

7  law. At all times mentioned, Defendants and DOES 1 through 50 were doing business at 300

8  Harding Blvd, Suite 214 Roseville, CA 95678 as an HCO. As a result, each of these Defendants

9  and DOES 1 through 50 are directly liable for the injuries and death JULIE EGELAND suffered.

10    11.    Additionally, the Defendants are or were joint venturers in the enterprise of

11  owning, operating, and managing the HCO known as HOMEWELL CARE SERVICES. The

12  Defendants have a joint interest in the ownership, operation, and management of HOMEWELL

13  CARE SERVICES, and a right to control it.

14    12.    Further, Defendants A.S.K. CONSULTING & DESIGN LLC dba HOMEWELL

15  CARE SERVICES, WELLTOWER OP, INC., SAMANTHA MCCOY; ANTHONY NOLE;

16  HOMEWELL CARE SERVICES INC.; HOMEWELL SENIOR CARE, INC.; and HOMEWELL

17  FRANCHISING INC. and DOES 1 through 50 are the alter egos of the dba called "HOMEWELL

18  CARE SERVICES" and vice versa, which creates a unity of interest between these Defendants.

19  The Defendants and DOES 1 through 50 have historically undercapitalized Defendant A.S.K.

20  CONSULTING & DESIGN LLC dba HOMEWELL CARE SERVICES, disregarded corporate

21  formalities, failed to keep minutes and adequate corporate records, failed to segregate funds of

22  allegedly separate entities, and compiled assets and liabilities of the Defendants other home care

23  organization franchisees.

24    13.    The Defendants and DOES 1 through 50 and their employees, consultants, service

25  providers, officers, directors, and/or managing agents had the responsibility and ability to

26  implement and enforce policies to prevent the reckless, malicious, oppressive, and fraudulent

27  conduct described in this Complaint. Defendants failed to implement and/or enforce such policies

28  in conscious disregard for the rights and safety of JULIE EGELAND.

1      14.    The true names and capacities of the Defendants named herein as DOES 1 through

2  50, inclusive, whether individual, corporate, associate, or otherwise, are unknown to Plaintiffs,

3  who therefore sue such Defendants by fictitious names pursuant to Code of Civil Procedure

4  section 474. Plaintiffs are informed and believe that said DOE defendants are California residents

5  and are responsible for the ownership, management, and operation of the HCO known as

6  HOMEWELL CARE SERVICES or were otherwise responsible for the injuries sustained by the

7  Plaintiffs. Plaintiffs will amend this Complaint to show such true names and capacities when they

8  have been determined.

9      15.    At all times mentioned herein, each and every Defendant was the agent and

10  employee of each and every other Defendant; and, in doing the things alleged, was acting within

11  the course and scope of such agency and employment; and, in doing the acts herein alleged, was

12  acting with the consent, permission, and authorization of each of the remaining defendants.  All

13  actions of each defendant herein alleged were ratified and approved by the officers or managing

14  agents of every other defendant.

15      16.    Plaintiffs are informed and believe, and thereby allege, that each of the Defendants

16  herein was at all times relevant hereto the agent, managing agent, employee, or representative of

17  the remaining defendants and was acting at least in part within the course and scope of such

18  relationship.

19                                    **JURISDICTION AND VENUE**

20      17.    Venue is proper in this Court because Defendants and DOES 1 through 50,

21  inclusive, reside and/or do business within the jurisdictional boundaries of the County of

22  Sacramento.

23                                      **FACTUAL ALLEGATIONS**

24      18.    JULIE EGELAND was born on September 25, 1940. She grew up in Marysville and

25  graduated with a Masters in Education from Yuba College. She met her husband when she was

26  working as an airline stewardess, and they were married for over fifty years until his death. Ms.

27  EGELAND later worked as a guidance counselor at Sierra Vista Junior High School.

28

19.    Before her injury and resultant death, Ms. EGELAND lived alone in her home and hired home care aides through Defendants' HCO to provide for her daily needs. She depended on the care aides to assist her with activities of daily living, including helping her out of bed, helping her ambulate in her home, cooking her meals, and generally providing for her needs. In August 2021, Ms. EGELAND signed a contract with Defendants' HCO obligating Defendants to provide home care aides to provide care and services to Ms. EGELAND twenty-four hours per day on an hourly basis. On September 23, 2022, despite this agreement in place and Ms. EGELAND's reliance on Defendants to send a home care aide to provide care to Ms. EGELAND at all times, no caregiver showed up on that morning after the previous shift ended. Thus, Defendants left Ms. EGELAND abandoned and without an aide to provide the care and services Ms. EGELAND needed. Neither of the aides assigned to Ms. EGELAND nor the Defendants notified Ms. EGELAND's family that there was no caregiver present with Ms. EGELAND. For hours, Defendants did not even attempt to verify that a home care aide was at Ms. EGELAND's home and caring for Ms. EGELAND. Defendants did not send another home care aide to replace the aide who did not show up for his or her shift.

20.    Further, Defendants did not have a contingency plan in place for replacing a caregiver who did not arrive for a shift. As a result of this failure, Ms. EGELAND was injured when she fell while attempting to make herself a meal because she did not have a caregiver to help her with ambulation or cooking. As a result of the fall, she was in extreme pain suffering from a fracture in her back and she was alone.

21.    When one of Defendants' home care aides finally arrived at Ms. EGELAND's home, the aide did not take Ms. EGELAND to the hospital, despite the fact that the aide was not licensed to diagnose or assess whether Ms. EGELAND needed medical services. The aide kept Ms. EGELAND at home and did not seek any kind of medical assistance for her injuries despite the fact that she was obviously in pain and was suffering. The aide did not notify Ms. EGELAND's family members of the fall or resultant injuries. Defendants also did not notify Ms. EGELAND's family members of the fall or resultant injuries. Ms. EGELAND's pain increased severely over the next three days. On September 29, 2022, Ms. EGELAND could not take it anymore and called

emergency services herself due to her severe back pain and was taken to the hospital. Medical providers at the hospital discovered that Ms. EGELAND had fractured her back. She was relocated to a skilled nursing facility to recuperate. However, she was never able to recover fully from her injuries caused by Defendants' negligence which resulted in a significant delay in getting necessary care. Ms. EGELAND died on October 8, 2022. Medical studies show that vertebral fractures, which Ms. EGELAND suffered as a direct result of negligence, are associated with increased mortality in the elderly.[1]

22.    Throughout Ms. EGELAND's time as a client purchasing home care services from Defendants, and given her frail and aged physical state of being, it was Defendants' and DOES 1 through 50's duty to provide the care and services she needed to continue to live in her home including taking care of her activities of daily living or assisting Ms. EGELAND with her activities of daily living; ensure that sufficient staff was available to provide the care and services; to notify Ms. EGELAND and her family if staff would be unavailable to provide the services she needed; provide Ms. EGELAND adequate care and supervision; and to protect Ms. EGELAND from dangerous conditions among others. The Defendants also owed a duty to Ms. EGELAND and her family to disclose all material facts that might influence Ms. EGELAND and her family on whether the organization could properly care for her, including the duty to disclose whether Defendants were capable of providing Ms. EGELAND with competent and consistent care.

23.    At all times relevant hereto, the Defendants and DOES 1 through 50 (including their owners, officers, directors, managing agents, and staff) had actual and constructive knowledge of the duties they owed to Ms. EGELAND including the duty to provide basic custodial care and the duty to not abandon Ms. EGELAND based on their assessments of Ms. EGELAND and based on the fact that the Defendants are exclusively in the business of providing such services to elderly and frail individuals and hold themselves out to the public as such. Thus, Defendants and DOES 1 through 50 demonstrably knew (1) that Ms. EGELAND required complete assistance and was

---

[1] Bliuc D, Nguyen ND, Milch VE, Nguyen TV, Eisman JA, Center JR. Mortality Risk Associated With Low-Trauma Osteoporotic Fracture and Subsequent Fracture in Men and Women. JAMA. 2009;301(5):513–521. doi:10.1001/jama.2009.50.

1 totally dependent on the Defendants for her activities of daily living and should not have been

2 abandoned; (2) that Ms. EGELAND was a high fall risk if she was not provided assistance; and (3)

3 that they knew or should have known that Ms. EGELAND was in severe pain after falling and

4 breaking her back and needed medical assistance.

5   24.  Throughout Ms. EGELAND's time as a client of Defendants, the Defendants and

6 DOES 1 through 50, by and through their management, employees, administration, agents, and

7 staff, knowingly and willfully breached these duties and failed to provide care and supervision to

8 Ms. EGELAND, failed to properly provide for her needs, failed to provide necessary goods and

9 services, withheld care and services (including basic assistance, ADLs and medical treatment)

10 causing her great injury and pain. These failures were made by Defendants despite their promises

11 to provide such care and subjected Ms. EGELAND to severe and extreme physical pain, mental

12 anguish, and distress.

### FIRST CAUSE OF ACTION

13

14          **(Negligence)**

15  **(By JULIE EGELAND by and through her Successor In Interest WILLIAM CLAIR)**

16 **(As Against Defendants A.S.K. CONSULTING & DESIGN LLC, SAMANTHA MCCOY, and**

17         ***ANTHONY NOLE)***

18   25.  Plaintiffs refer to and reallege paragraphs 1 through 24, inclusive as though set forth

19 fully herein.

20   26.  The Defendants, and each of them, by and through their management, agents, and

21 employees, owed a duty to Ms. EGELAND to ensure that she received the necessary level of care

22 as well as a duty to provide a safe and hazard-free environment and ensure there were caregivers

23 present to supervise her and provide for her needs and to not abandon her.

24   27.  During Ms. EGELAND's time as a client of Defendants' HCO, Defendants and each

25 of them acted negligently and recklessly and with conscious disregard with respect to Ms.

26 EGELAND. In particular, and without limiting the generality of the foregoing, Defendants and

27 each of them failed to exercise reasonable care toward Ms. EGELAND and acted with conscious

28

1  disregard of her rights, health, and safety, all of which caused injury and emotional distress to
2  Plaintiff when they:

3      a.  failed to ensure they could provide the level of care Ms. EGELAND needed
4          before agreeing to provide care;

5      b.  failed to ensure there was a system in place for when a scheduled caregiver
6          was unavailable;

7      c.  failed to notify Ms. EGELAND's family when a caregiver would not be
8          present;

9      d.  failed to provide a caregiver for all hours agreed to during which Ms.
10         EGELAND and her family reasonably expected a caregiver to be present;

11     e.  failed to ensure that Ms. EGELAND was not abandoned without care or
12         supervision;

13     f.  failed to immediately procure medical attention for Ms. EGELAND upon
14         learning that she had fallen and it was obvious that she sustained severe
15         injuries.

16     28.  As a client of Defendants' HCO, Ms. EGELAND required care and assistance with
17  daily living (i.e., grooming, bathing, hygiene, toileting, bed transfers, etc.) due to her physical
18  limitations and restriction of movement. As a result of this, Ms. EGELAND was totally dependent
19  upon Defendants for her care.

20     29.  By and through their management, employees, agents, and staff, Defendants
21  breached their duty of care to Ms. EGELAND by abandoning Ms. EGELAND, failing to ensure a
22  system was in place to replace scheduled caregivers when they were unavailable or did not show up
23  for work, failing to send a replacement for the caregiver who did not show up to work, failing to
24  inform Ms. EGELAND and her family when a caregiver was not available, failing to ensure that a
25  caregiver did not leave a dependent client until another caregiver arrived to take over the care,
26  failing to ensure Ms. EGELAND had proper supervision, and failing to seek medical attention for
27  Ms. EGELAND upon finding out that she had fallen and was injured and in severe pain.

28

COMPLAINT – 10

30.    Defendants failed to ensure that Ms. EGELAND was free from accidents or hazards, failed to ensure that Ms. EGELAND received care and supervision, and failed to ensure that she received proper medical attention, causing her great harm and pain and suffering. Defendants further failed to keep family members informed when a caregiver would not be present to allow Ms. EGELAND's family to make different arrangements for her care. Defendants failed to ensure that Ms. EGELAND had the necessary supervision and care to prevent her from falling by ensuring that a qualified home care aide was present to help with Ms. EGELAND's activities of daily living. Defendants failed to procure medical care for Ms. EGELAND upon discovering that she had fallen after being left alone when a reasonable caregiver would have immediately sought emergency medical care upon learning that Ms. EGELAND had fallen and injured herself. Defendants' recklessness and failures caused Ms. EGELAND to become seriously injured requiring hospitalization, loss of enjoyment in her life, and her death.

31.    As a proximate result of Defendants' acts and omissions, Ms. EGELAND sustained physical injuries and great mental and physical suffering.

32.    As a further direct and proximate result of Defendants' wrongful acts, Ms. EGELAND sustained special damages in an amount according to proof at trial.

33.    *Because the aforementioned conduct of the Defendants and DOES 1 through 50 was* carried out in a deliberate, outrageous, reckless, cold, callous and intentional manner in order to injure and damage Ms. EGELAND or, in the alternative, was despicable conduct carried on with a willful, reckless, profit-driven and conscious disregard for the rights and safety of others and subjected Ms. EGELAND to cruel and unjust hardship in conscious disregard for her rights, Plaintiffs request the assessment of punitive damages against the entity Defendants and DOES 1 through 50 in an amount according to proof.

WHEREFORE, Plaintiff prays for damages as set forth below.

\\

\\

\\

\\

### SECOND CAUSE OF ACTION

**(Fiduciary Fraud/Misrepresentation/Constructive Fraud)**

**(By JULIE EGELAND by and through her Successor In Interest WILLIAM CLAIR)**

**(As Against All Defendants)**

34.    Plaintiffs refer to and reallege paragraphs 1 through 33, inclusive as set forth fully herein.

35.    Both before and after Ms. EGELAND agreed to purchase Defendants' services, Defendants knowingly made false representations with an intent to deceive and/or induce reliance by Ms. EGELAND and her family and which resulted in a justifiable reliance by Ms. EGELAND which ultimately resulted in damages to her.

36.    Before and throughout Ms. EGELAND's time as a client of Defendants' home care organization, various staff, agents, and managers of Defendants represented to Ms. EGELAND and her family that Defendants would provide Ms. EGELAND with total care from a professional care staff that would provide all of the assistance with activities of daily living that Ms. EGELAND required, and 24-hour care in her home by Defendants' home care aides.  However, Defendants omitted material facts that were not known to Ms. EGELAND and her family or otherwise accessible to them, that it knew or should have known would have influenced Ms. EGELAND and her family's decision as to what organization and what kind of care to obtain for Ms. EGELAND and would have influenced the decision to choose and continue to use the services of Defendants.

37.    For example, Defendants did not disclose the fact that its organization was not properly organized to ensure it could and would provide caregivers for all agreed-upon hours. Defendants did not disclose that despite agreeing to provide caregivers to Ms. EGELAND such that she always had a caregiver in her home, the organization did not have a system in place to provide a replacement caregiver when a caregiver missed a shift. Defendants' contract with Ms. EGELAND, which the parties agreed to and signed before care was provided to Ms. EGELAND, stated

"Caregiver will be supervised by a [Care Manager] employed by the Agency on a day-to-day basis," which was one of many factors that caused Ms. EGELAND and her family to reasonably expect that a Care Manager would monitor the shifts of the caregivers and ensure that a caregiver was always available and present during the services times agreed upon by the parties and to rely on this representation. Despite this representation and agreement to the same, Defendant did not require a Care Manager to ensure that a caregiver was always present when the parties agreed a caregiver would be present. As a result, Ms. EGELAND suffered an injury on September 23, 2022, when Defendants did not ensure a caregiver would be available and present for that shift and no caregiver arrived.

38.    As another example, Defendants did not inform Ms. EGELAND's family when she was injured from the fall on September 23, 2022, allowing them to continue to believe that her needs were being provided for when in reality she needed medical care that the home care aides were incapable of providing. Had they known that the home care aides would not notify them of Ms. EGELAND's serious injuries and ensure that she had the necessary medical care, Ms. EGELAND and her family would not have chosen to use Defendants' services.   Further, Defendants represented in the agreement between Defendants and Ms. EGELAND that "each Caregiver is instructed to first call 911 then contact the Agency if a Client health-related emergency occurs while the Caregiver is present. Agency will immediately call any person identified by the Client below for emergency notification." Based on this representation, Ms. EGELAND and her family were led to believe that if Ms. EGELAND was injured and in need of emergency medical attention, Defendants would call 911 and obtain medical care for Ms. EGELAND and then inform the family. Defendants knew these representations were not true and Ms. EGELAND and her family would not have chosen Defendants' home organization had they known that it was not true. Defendants did not tell Ms. EGELAND or her family that their caregivers would not call 911 in the

event of a medical emergency. On September 23, 2022, Ms. EGELAND sustained a serious fracture to her back as a result of a fall when no caregiver was present. When a caregiver finally showed up, *the caregiver did not follow the policy Defendants represented the caregiver would follow, because* Defendants did not in fact instruct their caregivers to contact 911, nor did they verify that caregivers were doing so. If Ms. EGELAND and her family had known that Defendants, contrary to their *representations, would not contact 911 to obtain emergency medical services for Ms. EGELAND* when she fell and fractured her back, Ms. EGELAND and her family would not have chosen to obtain Defendants' services. Defendants failed to obtain medical services for Ms. EGELAND to continue making a profit on her and sell their services to her despite their knowledge that she needed a higher level of care than Defendants could provide.

39.    Furthermore, Defendants' website intentionally misleads clients and potential clients to believe that Defendants are capable of providing a higher level of care than they can in truth provide. Defendants' website represents, "Our flexible in-home care services can be tailored to meet the needs of any situation. From short-term adult care services to full-time 24-hour care, we can handle it all." The website also says, "We're here when you need us," and "Home care assistance when you need it, as soon as you need it." Defendants made this representation with the knowledge that they could not provide this care to clients due to their lack of a system for providing replacement staff. They promised that they could provide 24-hour care but did not have a system in place for when caregivers missed a shift, thus leaving their vulnerable clients abandoned.

40.    Further, Defendants' website represents that it provides "home health assistance to improve daily life." However, Defendants are licensed as a home care organization, not a home health organization. Under Health & Safety Code § 1726(b)(1), an organization that is not licensed as a home health agency shall not represent itself as a home health agency or imply through advertisement, soliciting, or presentments to the public that it is licensed to provide home health

1  services under that chapter. The website also makes other representations that misrepresent the level

2  of care Defendants are licensed to provide. Defendants' website states, "When your loved one can

3  no longer accomplish the basic tasks of daily living without assistance, our caregivers provide home

4  health assistance to improve daily life" and "When advanced health conditions require more

5  specialized care, our home health aide program can be tailored to meet your specific needs and

6  ensure your loved one's quality of life." Defendants misled the public by unlawfully representing

7  they were licensed to provide home health services when they were not. Defendants knowingly

8  misrepresented their services to cause Ms. EGELAND and other clients to pay higher prices for

9  care that Defendants in truth could not provide and knew they could not provide. Defendants

10  charged Ms. EGELAND tens of thousands of dollars a month.  Defendants misrepresented

11  themselves as providing home health services to induce Ms. EGELAND and other clients to pay

12  this high price for their services. Ms. EGELAND and her family relied on these representations and

13  would not have paid such a high price had they been informed of the true level of services

14  Defendants were licensed to provide.

17      41.    Despite holding itself out as providing *home health services*, Defendants were not

18  licensed as a home health agency and did not meet the statutory and regulatory requirements of

19  such. For example, under Health & Safety Code § 1736.1(a)(1), an applicant for certification as a

20  certified home health aide shall complete a training program with a minimum of 75 hours or an

21  equivalent competency evaluation program approved by the department pursuant to applicable

22  federal and state regulations. Defendants' caregivers were not certified home health aides and did

23  not have the training required under this statute to become home health aides. Defendants' home

24  care organization did not meet the definition of a home health agency despite representing itself as

25  such. Defendants and their home care aides were not qualified to provide home health services.

27      42.    Further, Defendants' website represents, "If your needs surpass the level of care that

COMPLAINT – 15

we can provide, we will help you find alternative solutions." It also says, "Homewell Care Services offers a free in-home assessment where we'll gauge each client's unique needs to recommend the *ideal level of at-home care for them*" and "*Additionally*, we understand that each client has unique and individual needs that sometimes fall outside of the scope of the services we provide, but our Care Management approach allows us to identify these needs and connect the dots to ancillary *services, such as skilled home health*." These statements were false and Defendants knew them to be false and stated them with full knowledge of their falsity. Defendants knew they were unable to provide caregivers to be present at all times for Ms. EGELAND, and caregivers who were qualified to provide home health services, which is what she needed, and yet they did not help her find alternative solutions that would provide the correct level of care. Instead, they represented they were capable of caring for her needs when they knew they were not to make a profit from her. When she fell and was in severe pain from fracturing her back, Defendants still did not seek additional care for Ms. EGELAND despite knowing she needed a higher level of care to recover from the fracture, and despite representing they would connect her to a higher level of care if she needed it. Defendants' caregivers were not licensed or trained to diagnose or assess her injuries but failed to obtain appropriate medical care for her.

43.     Defendants' representations on their website were false and were intended to induce elderly consumers such as Ms. EGELAND to purchase Defendants' services.  Yet, the promised care was not provided despite an unreasonable risk of harm to elderly residents such as Ms. EGELAND.

44.     Without Defendants' representations, Ms. EGELAND would not have purchased Defendants' services or continued to do so.  Ms. EGELAND was in a class of persons that was foreseeably injured by Defendants' representations to the public through its website and written and verbal representations, and, as a result, suffered damages as set forth herein.

45.    All of these representations were intentionally made to deceive and/or induce reliance by Ms. EGELAND.    Such representations did cause Ms. EGELAND to rely on *Defendant's representations* and she suffered monetary damages and physical and mental injuries as a result of her reliance on the statements of the Defendants.

46.    As a corporate-owned home care organization, Defendants were charged and entrusted with providing total care for Ms. EGELAND, an elder in a significant position of vulnerability because of her age and condition(s), who relied on Defendants for many of her most basic needs. Ms. EGELAND placed her trust, confidence, and well-being in Defendants. As such, when Ms. EGELAND chose to go with Defendants and thereafter during her time receiving Defendants' services, Defendants were in a position of power over Ms. EGELAND (i.e. they could decide whether or not to provide necessary goods and services) and were fiduciaries to Ms. EGELAND and, therefore, owed her and her family a fiduciary duty, which includes a duty to disclose material facts without concealment, misrepresentations, or half-truths and a duty to not allow a financial conflict of interest to adversely impact the care provided to Plaintiff.

47.    In breach of their fiduciary duty, Defendants consciously concealed important facts that would have impacted Ms. EGELAND's and her family's decision of whether to hire Defendants to provide care to Ms. EGELAND and their decision of whether to have her continue to use Defendants' services. Defendants failed to disclose they were not a home health agency and could not provide for all of Ms. EGELAND's needs. Defendants did so with the intent to induce Ms. EGELAND and her family to hire and continue to purchase Defendants' services and to maintain an additional source of profit for the home care organization. Had Ms. EGELAND and her family known Defendants could not provide for her needs and would not seek additional care when necessary, which they did not, they would not have chosen to hire and continue to purchase Defendants' services. The failure to provide this information became even more relevant once Ms.

1   EGELAND fell and suffered from a fractured back and Defendants did not inform Ms.

2   EGELAND's family of her injuries or seek additional care for her.

3       48.     By choosing to misrepresent the services they could provide in order to maximize

4   profits, Defendants breached their fiduciary duty owed to Ms. EGELAND to not allow a financial

5   conflict of interest to affect their decision-making and the level of care provided to Ms. EGELAND.

6   Therefore, Defendants committed constructive fraud.

7       49.     Said representations and omissions of material, harmful facts were made with the

8   intent and purpose of retaining Ms. EGELAND as a client of Defendants' home care organization

9   and also made with the intent of deceiving Ms. EGELAND so as to avoid complaints regarding the

10  quality of care and the threat of losing a potential income source.

11      50.     Ms. EGELAND and her family reasonably relied upon said representations to Ms.

12  EGELAND's detriment by deciding that the Defendants' organization was qualified and capable of

13  providing custodial care and supervision to Ms. EGELAND. Ms. EGELAND and her family further

14  reasonably relied upon said representations when she chose to remain a client of Defendants'

15  organization.

16      51.     As a direct and proximate result of the foregoing, Ms. EGELAND sustained injuries,

17  pain, suffering, and emotional distress through physical abuse and neglect in an amount to be

18  determined according to proof at trial.

19      52.     As a further direct and proximate result of the representation, Ms. EGELAND

20  sustained special damages in an amount to be determined according to proof at trial.

21      53.     By virtue of the foregoing, Defendants acted fraudulently, recklessly, and in

22  conscious disregard for the rights and safety of its clients, including Ms. EGELAND, and

23  consequently realized a financial benefit.  Accordingly, Defendants are required to disgorge those

24  financial benefits.

1      WHEREFORE, Plaintiffs pray for damages as set forth below.

2

### THIRD CAUSE OF ACTION

3

**(Unfair Business Practices Business and Professions Code § 17200)**

4

**(By JULIE EGELAND by and through her Successor In Interest WILLIAM CLAIR)**

5

**(As Against All Defendants)**

6      54.    Plaintiffs refer to and reallege paragraphs 1 through 53, inclusive as set though set

7 forth fully herein.

8      55.    The Defendants' conduct, as herein alleged, was and is a part of a general business

9 practice of the Defendants. The business practice exists in part because Defendants expected that

10 few adverse consequences would flow from their negligence and their misrepresentations about the

11 level of care they could and would provide to their elderly and vulnerable customers, and thus

12 Defendants made a considered decision to protect and promote their financial condition at the

13 expense of its legal obligations to their clients, including JULIE EGELAND.

14     *56.*    *Plaintiffs are informed and thereon allege that Defendants made a practice of*

15 misrepresenting to potential residents and their families the type, level, and extent of care that

16 would be provided to clients upon signing on to receive Defendants' services, including

17 intentionally causing clients to believe Defendants offered home health services when they did not

18 offer such services and were not licensed to do so, causing residents and their families to falsely

19 believe they would receive sufficient care, for Defendants to charge clients higher prices. Plaintiffs

20 are further informed and believe and thereon allege that Defendants failed to ensure their home care

21 aides met the requirements of Health & Safety Code § 1796.23 in passing a background check, in

22 violation of Health & Safety Code § 1796.43.

23     57.    These practices set forth above and elsewhere in this Complaint constitute unfair,

24 unlawful, and/or fraudulent business practices within the meaning of Business and Professions

25 Code § 17200, are violative of public policy, and are unethical, fraudulent, and injurious to

26 consumers, particularly the elderly and to dependant adults. JULIE EGELAND directly falls within

27 the category of individuals that Business and Professions Code § 17200 was designed to protect.

28

58.    As a result, Plaintiffs are entitled to restitution of all funds paid by Ms. EGELAND or on her behalf.

59.    As a result of Defendants' conduct, Plaintiffs have incurred and will incur attorneys' fees and related expenses in an amount to be proven at trial.

WHEREFORE, Plaintiff prays for damages as set forth below.

## FOURTH CAUSE OF ACTION

### (Financial Elder Abuse)

**(By JULIE EGELAND by and through her Successor In Interest WILLIAM CLAIR)**

**(As Against Defendants A.S.K. CONSULTING & DESIGN LLC, SAMANTHA MCCOY, and ANTHONY NOLE)**

60.    Plaintiffs refer to and reallege paragraphs 1 through 59, inclusive as though set forth fully herein.

61.    At all times mentioned herein, JULIE EGELAND was born on September 25, 1940, and during all times pertinent to this Complaint she was 82 years old and living in California. Thus, pursuant to California Welfare and Institutions Code § 15610.27 Ms. EGELAND was an elder.

62.    Defendants through their business, target elderly and/or dependent adults and take and obtain payments in exchange for alleged services they do not actually provide.

63.    In order to get elderly and/or dependent clients to pay their high fees, Defendants make false and misleading statements about the care and services that they provide. Throughout her time using Defendants' services, Defendants and DOES 1 through 50 obtained tens of thousands of dollars from JULIE EGELAND for services they did not provide.

64.    As set forth above, Defendants made promises in exchange for this money, both before and throughout the time Ms. EGELAND used Defendants' services that she would be provided with adequate supervision and necessary services and that they would be providing a very high-quality care (e.g., home health services) and that they were taking whatever steps were necessary to ensure Ms. EGELAND's safety and comfort. These claims were false and it led to Ms. EGELAND paying significant amounts of money and then being abandoned when one of Defendants' caregivers failed to show up for their shift leaving Ms. EGELAND abandoned without

1  the care and services she paid for which forced her to attend to her own needs leading to her falling

2  and breaking her back.  Thereafter, despite knowledge of the serious injuries Ms. EGELAND

3  sustained and the fact that she was suffering in pain, Defendants breached their obligations to Ms.

4  EGELAND when they failed to alert her family of her injuries or otherwise seek medical treatment

5  for her. Ms. EGELAND died as a result of her injuries.

6      65.    Each of the promises and guarantees alleged in this complaint were false and

7  fraudulent and Defendants knew or should have known at the time that these promises were made

8  that they were false and fraudulent.  Defendants also knew at the time that these promises were

9  made that they were unable to provide the promised level of care due to their failure to have

10  sufficient staffing or sufficient staff training or a backup system in case a caregiver did not show up

11  for work.  In short, Defendants breached their fiduciary duty to Ms. EGELAND and fraudulently

12  induced her to pay money through the use of false promises of services that they did not provide

13  and could not provide.

14      66.    Defendants knew or should have known that these false promises and omissions of

15  material facts would wrongfully lead Ms. EGELAND and her family to believe that she would be,

16  and was receiving, adequate care by using Defendants' services and that Defendants' failure to

17  deliver upon these promises would likely cause harm to Ms. EGELAND.

18      67.    Defendants' conduct was a substantial factor in causing Ms. EGELAND's harm.

19  Such harm includes loss of the money that was paid to Defendants for her care which was not

20  provided.

21      68.    Pursuant to Welfare and Institutions Code § 15610.30 et seq., Plaintiff is entitled to

22  general damages, special damages, compensatory damages, punitive damages, attorneys' fees, and

23  costs.  Defendants' false representations (and marketing) and omissions of material facts about the

24  level of care and services that Defendants would provide to Ms. EGELAND and similarly situated

25  elderly clients were made by owners, officers, directors, managing agents, and staff of Defendants.

26  Defendants' managing agents had actual and constructive knowledge that Defendants were not

27  providing the level of services that they promised to Ms. EGELAND and others.

28

1    69.    Because the aforementioned conduct of Defendants and DOES 1 through 50 was

2  carried out in a deliberate, cold, callous and intentional manner to injure and damage Ms.

3  EGELAND or, in the alternative, was despicable conduct carried on with a willful and conscious

4  disregard for the rights and safety of others and subjected Ms. EGELAND to cruel and unjust

5  hardship in conscious disregard for her rights, Plaintiffs request the assessment of punitive damages

6  against Defendants and DOES 1 through 50 in an amount according to proof.

7    *WHEREFORE, Plaintiffs pray for damages as set forth below.*

8

**FIFTH CAUSE OF ACTION**

**(Violation of California's Consumer Legal Remedies Act "CLRA" [California Civil Code §§**

**1750 et seq.])**

**(By JULIE EGELAND by and through her Successor In Interest WILLIAM CLAIR)**

**(As Against All Defendants)**

13    70.    Plaintiffs refer to and reallege paragraphs 1 through 69, inclusive as though set forth

14  fully herein.

15    71.    This cause of action is brought pursuant to the CLRA, California Civil Code § 1750

16  et seq.  Plaintiff as a purchaser of Defendants' home care services is a "consumer" pursuant to Civil

17  Code § 1761(d) and as someone over the age of 65 is a "senior citizen" pursuant to Civil Code §

18  1761(f).  Defendants' provision of home care services is "services" and a "transaction" pursuant to

19  Civil Code §1761(b) and (e).

20    72.    As described in this Complaint, Defendants violated and continue to violate the

21  CLRA by engaging in practices proscribed by California Civil Code § 1770(a) which were intended

22  to and did result in JULIE EGELAND and others to purchase Defendants' services including, but

23  not limited to:

- *Representing that services have characteristics that they do not have [Civil Code §
  1770(a)(5)];*

- Representing that goods or services are of a particular standard, quality, or grade, or that
  goods are of a particular style or model, if they are of another [Civil Code § 1770(a)(7)];

COMPLAINT – 22

1      •   Advertising goods or services with intent not to sell them as advertised [Civil Code §

2         1770(a)(9)];

3        73.    *As a result of these deceptive practices, JULIE EGELAND suffered injury in fact as*

4  described in this complaint and lost money as a result of Defendants' actions described herein.

5        74.    Pursuant to Civil Code § 1782, on September 18, 2023, Plaintiffs notified

6  Defendants in writing by certified mail of the particular violations of § 1770 of the CLRA and

7  demanded that they rectify the problems associated with the actions detailed above. If Defendants

8  fail to respond to Plaintiffs' letter and fail to agree to rectify the problems associated with the

9  conduct described in this complaint within 30 days of the date of the written notices, as proscribed

10 *by § 1782, Plaintiffs will move to amend this complaint to pursue claims for actual, punitive, and*

11 statutory damages, as appropriate against Defendants. As to this cause of action, at this time,

12 Plaintiffs seek only injunctive relief.

13       75.    Under the CLRA, a plaintiff may, without prior notification, file a complaint

14 alleging violations of the CLRA that seeks injunctive relief only. Then, the plaintiff may serve

15 written notice of said violations and if the defendant(s) does not remedy the CLRA violations

16 within 30 days of notification, the plaintiff may amend his or her CLRA cause of action without

17 leave of court to add claims for damages. Plaintiffs will amend this to add damages claims if

18 Defendants do not remedy its violations within the statutory period.

19       76.    Under the CLRA, Plaintiffs are entitled to a permanent injunction prohibiting

20 practices that violate the CLRA.

21       77.    For example, Defendants have an illegal practice of misrepresenting that the services

22 they provide have characteristics, standards, quality, and grades that they do not have such as

23 misrepresenting to JULIE EGELAND and her family that Defendants would provide home health

24 (as opposed to home care) services and that home care aids would be available and present 24-hours

25 a day. Defendants also have an illegal practice of advertising and making these misrepresentations

26 on their website(s), in their written contracts, and when interacting verbally with potential and

27 *existing clients like JULIE EGELAND. Therefore, Plaintiffs are entitled to a permanent injunction*

28 enjoining Defendants from such further illegal acts.

COMPLAINT 22

1    78.    Plaintiffs are also entitled to recover their attorneys' fees, costs, and expenses.

2    WHEREFORE, Plaintiffs pray for damages as set forth below.

3    ## SIXTH CAUSE OF ACTION

4    **(Wrongful Death)**

5    **(By WILLIAM CLAIR)**

6    **(As Against Defendants A.S.K. CONSULTING & DESIGN LLC, SAMANTHA MCCOY, and**

7    **ANTHONY NOLE)**

8    79.    Plaintiffs refer to and reallege paragraphs 1 through 78, inclusive as though set forth

9    fully herein.

10    80.    Plaintiff WILLIAM CLAIR is the surviving brother and heir of Decedent JULIE

11    EGELAND.

12    81.    As a proximate result of the Defendants' reckless neglect and/or reckless physical

13    abuse of Decedent JULIE EGELAND, she suffered injuries leading to and causing her death in an

14    undignified manner.

15    82.    As a further result of Defendants' negligence toward Decedent JULIE EGELAND,

16    Plaintiff WILLIAM CLAIR has been deprived of the society, comfort, companionship, attention,

17    services, support, and friendship of JULIE EGELAND to their damage in an amount to be proven at

18    trial.

19    WHEREFORE, Plaintiff prays for damages as set forth below.

20    ## PRAYER

21    1.    For special damages according to proof;

22    2.    For general damages according to proof;

23    3.    For costs of suit and attorney's fees herein incurred pursuant to Welfare and

24    Institutions Code § 15657, *et seq.*, Welfare & Institutions Code § 15610.30, Business

25    & Professions Code § 17200, and any other applicable statutes;

26    4.    For pre-judgment and post-judgment interest, if any, incurred;

27    5.    For reimbursement of medical expenses and skilled nursing facility expenses;

28    6.    Restitution pursuant to Business & Professions Code § 17200;

7.   For damages pursuant to all applicable provisions of the CLRA upon Defendants'
     failure to remedy and amendment of complaint;

8.   Punitive Damages;

9.   For declaratory, equitable, and/or injunctive relief as requested above; and

10.  For such other and further relief as the Court may deem proper.

Dated: September 18, 2023                    YORK LAW CORPORATION

                                             By: _____
                                             WENDY C. YORK
                                             DANIEL JAY
                                             VIRGINIA MARTUCCI
                                             Attorneys for Plaintiffs

CM-010

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>— Wendy C. York, SBN 166864/Daniel Jay, SBN 215860<br>*York Law Corporation*<br>1111 Exposition Boulevard, Building 500<br>Sacramento, CA 95815<br>TELEPHONE NO.: 916-643-2200   FAX NO.: 916-643-4680<br>ATTORNEY FOR *(Name):* Plaintiff, Julie Egeland (Decedent), et al. | FOR COURT USE ONLY |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  Sacramento
STREET ADDRESS: 720 Ninth Street
MAILING ADDRESS:
CITY AND ZIP CODE: *Sacramento, CA  95814*
BRANCH NAME:

CASE NAME:
Julie Egeland (Decedent), et al. v. A.S.K. Consulting & Design, et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| ☑ Unlimited (Amount demanded exceeds $25,000) ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☑ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☐ is ☑ is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties   d. ☐ Large number of witnesses
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. ☐ Substantial amount of documentary evidence   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☑ monetary   b. ☐ nonmonetary; declaratory or injunctive relief   c. ☑ punitive
4. Number of causes of action *(specify):* Six
5. This case ☐ is ☑ is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: September 18, 2023

Daniel Jay, SBN 215860
_____   ►_____
(TYPE OR PRINT NAME)   (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>*www.courtinfo.ca.gov* |

App. 88

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET**

CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice–Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

**CIVIL CASE COVER SHEET**

**App. 89**

# SUMMONS
## *(CITACION JUDICIAL)*

**SUM-100**

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):* A.S.K. CONSULTING & DESIGN LLC dba HOMEWELL CARE SERVICES; HOMEWELL CARE SERVICES, INC.; HOMEWELL SENIOR CARE, INC.; HOMEWELL SENIOR CARE, INC.; HOMEWELL FRANCHISING INC.; SAMANTHA MCCOY; ANTHONY NOLE; and DOES 1 through 50, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:** JULIE EGELAND (Decedent)
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):* and WILLIAM CLAIR, Individually and as Successor in Interest to JULIE EGELAND

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>Sacramento County Superior Court<br>720 Ninth Street<br>Sacramento, CA 95814 | CASE NUMBER:<br>*(Número del Caso):* |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Wendy C. York, SBN 166864/Daniel Jay, Esq., SBN 215860  916-643-2200    916-643-4680
York Law Corporation
1111 Exposition Blvd., Building 500
Sacramento, CA 95815

DATE:
*(Fecha)* **SEP 1 9 2023**
Clerk, by **K. JOHNSON** , Deputy
*(Secretario)*                     *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒☒ on behalf of *(specify):* Homewell Franching, Inc.
   under: ☒☒ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)      ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465

**App. 90**

# EXHIBIT 1-C

**From:** Bishop, Shawna <Shawna.Bishop@Markel.com>
**Sent:** November 01, 2023 10:14 AM
**To:** Angie Goad <agoad@homewellcares.com>
**Cc:** KJRussell@locktonaffinity.com; Casey McCleskey <cmccleskey@homewellcares.com>; adrian.azer@haynesboone.com; Elizabeth.Weldon@haynesboone.com
**Subject:** RE: Acknowledgement Letter - HomeWell Franchising, Inc. - Markel Claim No. EO407722 - Ref: Julie Egeland

[EXTERNAL E-MAIL]

Angie,

I am in receipt of the September 18, 2023 letter from York Law Corporation attaching an unfiled Complaint on behalf of Julie Egeland (decedent) and William Clair. I am reviewing the matter under Evanston Insurance Company Policy MKLV4PEO001962 (the "Policy") issued to HomeWell Franchising, Inc. for the policy period of 9/1/23 – 9/1/24. The Policy has a limit of liability of $1,000,000 per claim and $1,000,000 in the aggregate, subject to a deductible of $35,000 per claim and $105,000 in the aggregate.

I would like to speak with you about this matter. I am available today from 2pm – 5pm ET; Thursday from 1pm – 5pm ET; and on Friday from 1pm – 4pm ET. Please let me know if you have any availability during these times. If not, we can schedule a call for early next week.

Thank you.

**Shawna Bishop, Esq.**
**Sr. Claims Specialist, Miscellaneous Errors and Omissions**

Claims Division
Markel®
California License No. OD95581
Phyllis Modlin, Qualified Manager, California License No. 2M36698
Red Bank, NJ
Direct: (732) 889-1078

markel.com



   

To report a new loss, please click here. For all other correspondence please click here. Our privacy policy may be viewed here.

*"This message and its contents contain highly sensitive, confidential, and privileged information only accessible by the intended recipient for solely permissible and authorized business purposes. This message nor its contents may be*

*disclosed, shared, displayed, discussed, copied, disbursed or disseminated by the intended recipient or any other party for any reason. This message and its contents are to be completely and securely destroyed immediately after its business use has been fulfilled. If you are not the intended recipient, you are hereby notified that any disclosure or use of this message and its contents are strictly prohibited. If you have received this communication in error, please notify the sender immediately and destroy all copies of this message and its contents immediately."*

**From:** Angie Goad <agoad@homewellcares.com>
**Sent:** Wednesday, November 1, 2023 10:52 AM
**To:** Piquette, Will <Will.Piquette@markel.com>
**Cc:** Bishop, Shawna <Shawna.Bishop@Markel.com>; NSchiro@mdoinsurance.com; KJRussell@locktonaffinity.com; Casey McCleskey <cmccleskey@homewellcares.com>
**Subject:** RE: Acknowledgement Letter - HomeWell Franchising, Inc. - Markel Claim No. EO407722 - Ref: Julie Egeland

Thank you! This has been received on our end as well.

Respectfully,

**Angie Goad**
Accounting Manager
HomeWell Franchising Inc.
812 Sheppard Rd
Burkburnett, TX 76354
O: 817.203.8313  |  D: 940.247.7212

homewellcares.com

**Trusted Care.** True Compassion.˙



**From:** Piquette, Will <Will.Piquette@markel.com>
**Sent:** Wednesday, November 1, 2023 9:44 AM
**To:** Angie Goad <agoad@homewellcares.com>
**Cc:** Bishop, Shawna <Shawna.Bishop@Markel.com>; NSchiro@mdoinsurance.com; KJRussell@locktonaffinity.com
**Subject:** Acknowledgement Letter - HomeWell Franchising, Inc. - Markel Claim No. EO407722 - Ref: Julie Egeland

[EXTERNAL E-MAIL]

Please see attached acknowledgement letter.

Thank You,

**Will Piquette**
**Claims Technician**
**Markel – Claims**

Direct: +1.804.955.1869
Internal: ext. 101869

4600 Cox Road
Glen Allen, VA 23060

**markel.com**



   

Please report all new losses to newclaims@markel.com and send all other Claims correspondence to markelclaims@markel.com.  Services provided through Markel Service, Incorporated/Markel West, Inc. (California) for Markel-affiliated insurance companies.  Please review our privacy policy at www.markel.com/privacy-policy.

**App. 94**

# EXHIBIT 1-D

**From:** Bishop, Shawna <Shawna.Bishop@Markel.com>
**Sent:** Wednesday, January 24, 2024 9:48 AM
**To:** Casey McCleskey <cmccleskey@homewellcares.com>
**Subject:** RE: HomeWell Franchising / Julie Egeland / Markel Claim EO407722

[EXTERNAL E-MAIL]

Casey,

Are you available to schedule a call to discuss tomorrow? Evanston will not be offering defense or indemnity coverage for this matter based on the policy exclusions outlined in my November 18, 2023 email, which is attached.

I am free tomorrow from 1pm – 5pm ET. Thanks.

**Shawna Bishop, Esq.**
**Sr. Claims Specialist, Miscellaneous Errors and Omissions**

Claims Division
Markel®
California License No. OD95581
Phyllis Modlin, Qualified Manager, California License No. 2M36698
Red Bank, NJ
Direct: (732) 889-1078

markel.com



   

To report a new loss, please click here. For all other correspondence please click here. Our privacy policy may be viewed here.

*"This message and its contents contain highly sensitive, confidential, and privileged information only accessible by the intended recipient for solely permissible and authorized business purposes. This message nor its contents may be disclosed, shared, displayed, discussed, copied, disbursed or disseminated by the intended recipient or any other party for any reason. This message and its contents are to be completely and securely destroyed immediately after its business use has been fulfilled. If you are not the intended recipient, you are hereby notified that any disclosure or use of this message and its contents are strictly prohibited. If you have received this communication in error, please notify the sender immediately and destroy all copies of this message and its contents immediately."*

**App. 96**

**From:** Casey McCleskey <cmccleskey@homewellcares.com>
**Sent:** Wednesday, January 24, 2024 10:30 AM
**To:** Bishop, Shawna <Shawna.Bishop@Markel.com>
**Subject:** RE: HomeWell Franchising / Julie Egeland / Markel Claim EO407722

Hi Shawna,

I wanted to follow up on our representation for this claim.

I'll summarize what I was hoping to address on the call. We have already retained Haynes Boone as our counsel for this issue as there were deadlines necessary to be addressed before our claim was processed by Markel. I haven't seen any referrals for representation from Markel and would like to request that Haynes Boone remain our counsel. I am sure there prearranged firms you refer customers to, but due to the sensitive nature of this wrongful death case in the state of California, I must insist that you reconsider a this referral in place of our current counsel.

In any event, I would like to discuss rates and coverage of fees, as we have already incurred significant costs for a case we believe to be covered by our policy.

Please let me know if you'd like to discuss or if there's anything additional that I can provide.

Thank you,

**Casey McCleskey**
Chief Financial Officer
HomeWell Franchising Inc.
Phone: 817-203-8313

---

**From:** Casey McCleskey
**Sent:** Wednesday, January 10, 2024 4:10 PM
**To:** Bishop, Shawna <Shawna.Bishop@Markel.com>
**Subject:** RE: HomeWell Franchising / Julie Egeland / Markel Claim EO407722

Hi Shawna,

I apologize for not reconnecting sooner. I hope you were able to enjoy a nice break during the holidays.

I was hoping we could revisit the topic of counsel regarding our case at your availability.

Regards,

**Casey McCleskey**
Chief Financial Officer
HomeWell Franchising Inc.
Phone: 817-203-8313

---

**From:** Bishop, Shawna <Shawna.Bishop@Markel.com>
**Sent:** Tuesday, December 5, 2023 12:36 PM
**To:** Casey McCleskey <cmccleskey@homewellcares.com>
**Cc:** Azer, Adrian <Adrian.Azer@haynesboone.com>; Weldon, Elizabeth <Elizabeth.Weldon@haynesboone.com>
**Subject:** RE: HomeWell Franchising / Julie Egeland / Markel Claim EO407722

[EXTERNAL E-MAIL]

Casey,

My schedule is generally open on Wednesday and Thursday this week from 10am – 4pm Eastern. You are welcome to send me a calendar invite for a call. Thank you.

**Shawna Bishop, Esq.**
**Sr. Claims Specialist, Miscellaneous Errors and Omissions**

Claims Division
Markel®
California License No. OD95581
Phyllis Modlin, Qualified Manager, California License No. 2M36698
Red Bank, NJ
Direct: (732) 889-1078

markel.com



To report a new loss, please click here. For all other correspondence please click here. Our privacy policy may be viewed here.

*"This message and its contents contain highly sensitive, confidential, and privileged information only accessible by the intended recipient for solely permissible and authorized business purposes. This message nor its contents may be disclosed, shared, displayed, discussed, copied, disbursed or disseminated by the intended recipient or any other party for any reason. This message and its contents are to be completely and securely destroyed immediately after its business use has been fulfilled. If you are not the intended recipient, you are hereby notified that any disclosure or use of this message and its contents are strictly prohibited. If you have received this communication in error, please notify the sender immediately and destroy all copies of this message and its contents immediately."*

**From:** Casey McCleskey <cmccleskey@homewellcares.com>
**Sent:** Tuesday, December 5, 2023 1:05 PM
**To:** Bishop, Shawna <Shawna.Bishop@Markel.com>
**Cc:** Azer, Adrian <Adrian.Azer@haynesboone.com>; Weldon, Elizabeth <Elizabeth.Weldon@haynesboone.com>
**Subject:** RE: HomeWell Franchising / Julie Egeland / Markel Claim EO407722

Hi Shawna,

I was hoping we could get a few minutes on the phone to discuss our coverage. Specifically I'd like to address the matter of counsel, which has been necessary for me to retain independently to timely respond to the demands and deadlines of our case.

If you could, please let us know a few times that may be convenient for you.

**App. 98**

Thank you,

**Casey McCleskey**
Chief Financial Officer
HomeWell Franchising Inc.
Phone: 817-203-8313

---

**From:** Bishop, Shawna <Shawna.Bishop@Markel.com>
**Sent:** November 14, 2023 12:40 PM
**To:** Casey McCleskey <cmccleskey@homewellcares.com>
**Cc:** KJRussell@locktonaffinity.com; adrian.azer@haynesboone.com; Elizabeth.Weldon@haynesboone.com
**Subject:** HomeWell Franchising / Julie Egeland / Markel Claim EO407722

[EXTERNAL E-MAIL]

Casey,

Thank you for speaking with me last week. This email confirms our conversation and my preliminary coverage determination based on review of the Complaint filed on behalf of Julie Egeland (decedent) and William Clair on September 18, 2023 in the Superior Court of the State of California, Sacramento County.  I have reviewed the matter under Evanston Insurance Company Policy MKLV4PEO001962 (the "Policy") issued to HomeWell Franchising, Inc. (the "Insured") for the policy period of 9/1/23 – 9/1/24. The Policy has a limit of liability of $1,000,000 per claim and $1,000,000 in the aggregate, subject to a deductible of $35,000 per claim and $105,000 in the aggregate.

The Policy provides that Evanston will pay for Damages and Claim Expenses as a result of a Claim first made against the Insured by reason of a Wrongful Act or Personal Injury in the performance of Professional Services. The Franchisors Endorsement attached to the Policy defines Professional Services as: 1. Providing training programs, operations manuals, and other aids necessary for the start-up of a franchise; 2. Providing informational bulletins and newsletters; 3. Giving advice and assistance in the start-up, management, and operation of a franchise, including site selection and the determination, designation, or modification of the franchise territory; 4. Administration of advertising and promotional programs; 5. Providing assistance to franchisees in marketing the services, goods, or products of the franchisee; 6. Development and administration of operating standards, specifications, or operating procedures for franchisees; or 7. The preparation, amendment, renewal, or registration of a Franchise Disclosure Document. The Complaint asserts that the Insured misrepresents the grade of services that their franchisees provide in its advertising and promotional products. Therefore, it appears the Insuring Agreement for the Professional Liability Coverage Part of the Policy has been triggered.

However, there are certain exclusions that may apply to limit or exclude coverage for this matter.

Pursuant to Section IV.C. the Policy excludes coverage for Claims based upon or arising out of any actual or alleged Bodily Injury. The Policy defines Bodily Injury as "bodily injury, sickness, or disease sustained by a person, including death resulting from any of these; however, Bodily Injury shall not include:1. Humiliation or the infliction of emotional distress arising solely from Personal Injury; or 2. Sexual Injury." The Complaint alleges that Egeland sustained physical injury leading to her death, as a result of ASK Consulting & Design LLC dba Homewell Care Services' failure to render basic custodial care and failure to provide a safe environment. As a result, it appears that Exclusion C. may apply to this matter. Evanston reserves the right to limit or disclaim coverage for the Claim on this basis.

Additionally, the Policy contains an Endorsement titled, Exclusion – Vulnerable Adult Abuse, which excludes coverage for Claims based upon, arising out of, or in any way involving any actual or alleged Vulnerable Adult Abuse including, but not limited to, Wrongful Acts related to: a. The employment, supervision, or retention of persons who actually or allegedly engaged in Vulnerable Adult Abuse; b. The reporting to authorities of Vulnerable Adult Abuse; or c. The failure to do any of the foregoing. Vulnerable Adult Abuse is defined as "any act, error, or omission which actually or allegedly results in Bodily Injury or Personal Injury to any Vulnerable Adult. This includes violation of any federal, state, or local statute, law, rule, ordinance, or regulation that addresses, governs, or prohibits abuse, neglect, or exploitation of Vulnerable Adults." A Venerable Adult is defined as "any person who: 1. Is 60 years of age or older who has the functional, mental, or physical inability to care for himself or herself; 2. Is determined by a court of law to be incapacitated; 3. Has a developmental

4

disability as defined by the law of the state of the person's residence; or 4. Is receiving services from a licensed home health, hospice, or home care agency." The Complaint states that Egeland was 82 years old and in need of twenty-four hour homecare at the time that she sustained physical injury leading to her death. Therefore, Egeland qualifies as a Vulnerable Adult under the Policy. As a result, it appears that the Vulnerable Adult Abuse Exclusion may apply to this matter. Evanston reserves the right to limit or disclaim coverage for the Claim on this basis.

Finally, the Policy contains an Endorsement titled, Exclusion – Medical Malpractice, which excludes coverage for Claims based upon, arising out of, or in any way involving medical malpractice including, but not limited to, patient treatment, consultation with patients, or rendering medical opinions in specific treatment of any patient as the consulting medical care provider for a second opinion or primary care. The Complaint states that Egeland required twenty-four hour homecare which was being provided by ASK Consulting & Design LLC dba Homewell Care Services. In the event that any defendant was providing treatment or medical care to Egeland, Evanston reserves the right to limit or disclaim coverage for the Claim pursuant to the Medical Malpractice Exclusion.

A formal letter will be forthcoming. Evanston reserves all of its rights under the Policy to limit or disclaim coverage as explained herein. Thank you.

**Shawna Bishop, Esq.**
**Sr. Claims Specialist, Miscellaneous Errors and Omissions**

Claims Division
Markel®
California License No. OD95581
Phyllis Modlin, Qualified Manager, California License No. 2M36698
Red Bank, NJ
Direct: (732) 889-1078

markel.com



To report a new loss, please click here. For all other correspondence please click here. Our privacy policy may be viewed here.

*"This message and its contents contain highly sensitive, confidential, and privileged information only accessible by the intended recipient for solely permissible and authorized business purposes. This message nor its contents may be disclosed, shared, displayed, discussed, copied, disbursed or disseminated by the intended recipient or any other party for any reason.  This message and its contents are to be completely and securely destroyed immediately after its business use has been fulfilled.  If you are not the intended recipient, you are hereby notified that any disclosure or use of this message and its contents are strictly prohibited.  If you have received this communication in error, please notify the sender immediately and destroy all copies of this message and its contents immediately."*

**App. 100**